IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 25, 2001

## STATE OF TENNESSEE v. LEONARD EDWARD BAUGH, JR., DAMIAN LAMAR OWES, and MARQUEZ DONNELL CRENSHAW

**Direct Appeal from the Criminal Court for Davidson County
No. 99-C-1934     Steve R. Dozier, Judge**

---

**No. M2000-00477-CCA-R3-CD  - Filed June 1, 2001**

---

The co-defendants, Leonard Edward Baugh, Jr., Damian Lamar Owes, and Marquez Donnell Crenshaw, were indicted by the Davidson County Grand Jury on one count of especially aggravated robbery, five counts of especially aggravated kidnapping, one count of aggravated burglary, and one count of aggravated assault.  Baugh was additionally indicted on one count of resisting arrest and one count of unlawful possession of a weapon by a convicted felon.  The counts of aggravated assault were later dismissed. Following their joint trial, all co-defendants were found guilty of especially aggravated robbery, five counts of especially aggravated kidnapping, and aggravated burglary. Baugh was also convicted of unlawful possession of a weapon by a felon.  On appeal, each of the co-defendants challenges the sufficiency of the convicting evidence, arguing that the State failed to offer sufficient proof of identity.  After a thorough review of the record, we affirm the judgments of the trial court.  The matter is remanded to the trial court for correction of clerical errors in the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and
Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA McGEE OGLE, JJ., joined.

William A. Lane, Murfreesboro, Tennessee, for the appellant, Leonard Edward Baugh, Jr.; Dwight E. Scott (on appeal) and David Byrne (at trial), Nashville, Tennessee, for the appellant, Damian Lamar Owes; and Neil R. Flit, Nashville, Tennessee, for the appellant, Marquez Donnell Crenshaw.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Derrick L. Scretchen, Assistant District Attorney General; and Brian K. Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At the conclusion of their joint trial, the defendants, Leonard Edward Baugh, Jr., Damian Lamar Owes, and Marquez Donnell Crenshaw, were each convicted by a Davidson County Criminal Court jury of one count of especially aggravated robbery, five counts of especially aggravated kidnapping, and one count of aggravated burglary. Baugh was also convicted of one count of unlawful possession of a weapon by a felon. Baugh and Owes received effective sentences of thirty years, and Crenshaw received an effective sentence of twenty-seven years. Following the denial of their motions for a new trial, the defendants timely appealed to this court. On appeal, each defendant argues that the evidence at trial was insufficient for a rational trier of fact to find him guilty beyond a reasonable doubt of the crimes for which he was convicted. Based upon a careful review, we affirm the judgments of the trial court.

## FACTS

In the early morning hours of November 12, 1998, four masked men broke into the north Nashville two-bedroom home of Betty Jean Mitchell. Ms. Mitchell and her boyfriend, Michael Pritchard, were asleep in one bedroom, and Ms. Mitchell's two sons, eighteen-year-old Mario Mitchell and thirteen-year-old Geno Smith, were asleep in the second bedroom, when men shouting "Police! Police!" kicked in the front door of their home on Vance Avenue.

The armed, masked men who entered the house were not the police. They bound Ms. Mitchell, Michael Pritchard, and Geno Smith with duct tape, and shot Mario Mitchell twice in the leg, demanding that he tell them where the money and guns were hidden. Ransacking the house, the men found and took approximately $800 in cash and a nine-millimeter gun belonging to Mario.[1] When they threatened to kill him if he did not tell them where the rest of the money was hidden, Mario lied, telling them that his cousin was staying at Mario's former residence, a house on 12th Avenue, and that they would find his money there. Instead of leaving him behind, the men dragged Mario into the hallway, where they shot him again in the leg. They then carried him outside to his sport utility vehicle, put him inside, and drove him to his former residence.

At the house on 12th Avenue, the men took Mario to the back porch and ordered him to yell for his cousin. When the man and woman who were in the apartment came out, the men forced either one or both of them back inside at gunpoint, ransacked the apartment, and demanded money. Before taking flight, one of the men shot Mario once more, grazing his chest with a bullet. While still in the emergency room, Mario told police that he had recognized three of the men as acquaintances from his neighborhood. Approximately one week later, he identified all three defendants from a series of photographic lineups.

The State's first witness at the defendants' joint trial was Ms. Mitchell. She testified that she and Michael Pritchard were asleep in the front bedroom when they were awakened some time between 2:00 and 4:00 a.m. on November 12, 1998, by the sound of her front door being kicked in by men pretending to be the police. By the time Pritchard could get out of bed, four men were

---

[1] We utilize the first name of this victim for purposes of clarity, two of the victims having the same last name.

inside the house demanding to know where the money and guns were kept. The men split up, with one tying up her and Pritchard with duct tape in their bedroom, one going into the back bedroom where her sons were sleeping, and the others ransacking the house. Ms. Mitchell said that after binding them with tape, one man threw a mattress on top of her and Pritchard as they lay on the floor. When Pritchard whispered to her that he feared they were not going to make it through the ordeal alive, the man said, "Nigger, don't you move," and fired his gun into the floor beside Pritchard's head.

As she lay bound and gagged on the floor, Ms. Mitchell could hear one of the men in her sons' bedroom saying, "Nigger, where is the money and the guns?" She heard Mario answer, "This is my mama's house, ain't no money and guns in here." She next heard two gunshots, and one of the men saying, "Nigger, you think we playing with you?" Ms. Mitchell testified that after shooting Mario twice, the men dragged him into the hallway, where they shot him again. They then dragged him outside, where she could hear them trying to start his jeep.[2] As they dragged him out, she heard one say to the other, "Let's take this nigger and throw him in the river." Before driving off, one of the men came back into the house and pulled the telephone out of the wall. As the jeep was being driven away, she heard another car pull out and follow it down the street. When the men had gone, Pritchard managed to free himself and Ms. Mitchell. She untied her son Geno, and the three of them drove to a pay phone and called the police.

Ms. Mitchell testified that at one point during their ordeal, two men were in the bedroom with her and Pritchard. She saw two others as they went down the hallway past her bedroom to her sons' bedroom. She called out to one of those two, pleading that he not kill Mario in her house. Standing in the doorway to her bedroom, he answered her, "Bitch, ain't nobody gonna kill nobody." As he spoke, she was able to see that his top front teeth were gold, with the number "12" inscribed into them. According to Ms. Mitchell's testimony, all four men had guns and wore "leather-type" masks. In addition to the man with "12" inscribed on his front teeth, another one of the four had a mouthful of gold teeth.

On cross-examination, Ms. Mitchell acknowledged that she had not seen any of the men without their masks. She admitted that she wore prescription eyeglasses, and that she had not been wearing them when she spoke to the man with the "12" on his front teeth. She had seen the "12" by the light from the bathroom, which had shone on the man as he stood in the hallway. The light in her bedroom had not been on. She admitted that she had not mentioned the numbered teeth to the police who initially investigated the crime, but said that they had not asked her to provide those kind of details.

Michael Pritchard's testimony was substantially similar to that of Ms. Mitchell, with only minor variations in some details. He testified that he had been awakened at about three or four in the morning on November 12, 1998, by men kicking in the front door and yelling, "This is the police;

---

[2]Throughout their testimony, both Ms. Mitchell and Michael Pritchard referred to Mario's vehicle as a "jeep." This vehicle apparently was, in fact, a "souped up" Chevrolet Blazer.

this is the police."  By the time he had scrambled into some clothes and made it to the doorway of the bedroom he shared with Ms. Mitchell, four masked, armed men were already in the house.  Three were wearing ski masks, and one had a bandana tied across the lower part of his face.  Two of the men had gold teeth.  The men ordered him back into the bedroom and onto the floor, where one of the men bound him and Ms. Mitchell with tape, and another ransacked the bedroom. Two others headed back towards the bedroom in which Ms. Mitchell's sons were sleeping.

Pritchard testified that he heard one of the men call Mario by name, asking him where the money and guns were kept.  He heard a gunshot, followed by cries from Mario that he had no money or guns.  The first gunshot was followed by a second.  One of the men then shot into the floor of the bedroom in which he and Ms. Mitchell were lying, directly in front of him.  After the third shot had been fired, the men dragged Mario into the hallway, where they shot him again.  He heard one man say, "Well, we just gonna carry him and dump him off in the river."  The men dragged Mario, who was calling out for his mother, out of the house.  As the men were trying to start Mario's jeep, Pritchard managed to free himself and creep to a window in time to see Mario's jeep being driven down the street, followed by a black, four-door car.

On cross-examination, Pritchard testified that the light in the back bedroom had been on, but that neither the light in his and Ms. Mitchell's bedroom, nor the light in the bathroom, was on.  He stated that three of the men wore ski masks.  A fourth had on a "black-looking" toboggan on top of his head and a bandana covering the lower part of his face.  On redirect, he said that he believed the bandana had been red.

Geno Smith, who was fourteen at the time of the trial, testified that after he had gone to bed on the evening of November 11, 1998, his older brother had come in to spend the night on the floor in his bedroom. He had been awakened later by a "BOOM, BOOM" sound and men saying "Police, police."  Four armed men dressed in black and wearing stocking caps and hoods  rushed through the house, saying, "Where you at; where you at?"  Turning on the light in his mother's room, they said, "He ain't here; he ain't here."  They turned on the light in his bedroom and said, "Wake him up." Two of the four men went into his mother's bedroom, and two came into his bedroom.

One of the men wore a black bandana with a white design across the lower part of his face, and another man was dressed in black overalls with a hood.  One of the two, a "big dude," pointed a gun in his face and asked him if he knew anything about some money or a gun.  He told them that he did not.  Calling Mario by name, the men kicked him awake and demanded that he tell them where the money was.  When Mario told them that he did not know what they were talking about, one of the men shot him once in the leg, saying, "You think we playing with you?"  "[B]arking out orders," the one who had shot Mario, a "short," "real cocky" man, sent the others through the house to search for "whatever they was looking for."  After the men had found "something," they shot Mario again in the leg. When Mario told them that his house was on 12th Avenue, the men ordered him to get up and take them there.  Mario told them he could not stand.  The men tied Smith up with duct tape, and dragged Mario to the hallway, where they shot him again.  The men ripped the cord out of the phone, dragged Mario outside, put him in his car, and left.

On cross-examination, Smith testified that the lights in his bedroom and in his mother's bedroom had been turned on. He was sure that the bandana worn by one of the armed men had been black, rather than red. The man with the bandana had a black stocking cap on his head. He had not heard his brother call any of the men by name.

Nineteen-year-old Mario Mitchell, who said that he was currently in jail awaiting trial on drug charges, testified that he had known all three defendants for some period of time prior to the incident of November 12, 1998. He had become acquainted with Baugh and Owes in his north Nashville neighborhood during the summer of 1997, and had known Crenshaw since 1992 when they played in the same baseball league. On the evening of November 10, 1998, he had run into Baugh at a convenience store, where Baugh mentioned to him that the 12th Avenue house that he had lived in for about a month in October 1998 had just been raided by the police. He saw Baugh again the next evening, November 11, when Baugh and Owes stopped to chat with him on the street as he waited for his overheated truck to cool down. Owes was wearing black overalls and a maroon, hooded sweatshirt, while Baugh was dressed in a silver and black "Fubu" jacket and Nike air shoes. After his truck had cooled, he left, telling Baugh and Owes that he was going home.

When he got to his mother's house, he lay down on the floor in his brother's bedroom and went to sleep, to be later awakened by his brother telling him to get up because someone was in the house. The next thing he remembered was the bedroom door opening, the light coming on, and a masked man coming into the room. The man was wearing a dark blue bandana with a white design and the "exact" Fubu jacket, Nike air shoes, and sweatshirt that he had earlier seen on Baugh. The man shot him above the ankle and demanded money. Mitchell testified that when the man spoke, he immediately recognized him as Baugh. He said that Baugh has a distinctive, high pitched voice that is easy to recognize.

Mitchell testified that another man, armed with an automatic gun and dressed in a ski mask, dark jeans, and a hooded sweatshirt, came into the bedroom to search for money. This man, whom he identified as Crenshaw, discovered a nine-millimeter gun that Mitchell had in the house. He said that he was able to identify the man as Crenshaw because he later removed his mask, both while still inside the house, as he was searching for money and guns, and outside the house, as he drove Mitchell to the 12th Avenue residence. Later, Owes came into the bedroom with his mask completely off. In addition to recognizing their faces, he also recognized Owes's and Crenshaw's voices. He said that all the lights in the house were on.

Mitchell testified that he was shot three times in the left leg while he was in the bedroom, and once in the right leg after he had been dragged to the hallway. Later in his testimony, he stated that it was Baugh who shot him each time. He said that Baugh searched him, finding and taking less than $800 in cash that he had in his pocket. The men also took his nine-millimeter gun. When they threatened to kill him and his family if they did not get more money, he lied, telling them that he had money at his residence on 12th Avenue.

The men bound Mitchell's hands with tape and carried him outside to his Chevrolet Blazer. Crenshaw and Owes got into the truck with him, while Baugh and the fourth man, whom he could not identify, got into another vehicle. Inside the truck, Crenshaw and Owes removed their masks again, telling him not to look at them. After struggling for five or ten minutes to uncover the secret to his keyless ignition system, they were able to get the vehicle started, and drove him to the alley behind the 12th Avenue residence. As they waited for the other men to join them, he saw Baugh and the fourth man running through a field toward the truck. During those "five, six, seven" seconds, Baugh was unmasked, and Mitchell was able to see his face.

The men pulled him from the truck and dragged him to the back porch of the house, where they made him yell for his cousin. When the man and woman who were staying in the house came out, the man was forced back inside at gunpoint. From the porch, Mitchell could hear the men demanding money and ransacking the apartment. He was unsure of where the woman was during this interval. Baugh and someone else, whom he could not identify, pulled him from the back porch into the utility room. When the other three had left, Baugh stayed behind with him in the utility room, saying, "It's only me and you back here, no witnesses. Tell me where it is now. . . . You need to tell me where it is before I kill you." Mitchell said that when he told Baugh that he did not know what he was talking about, Baugh fired his gun at him, grazing his chest, and ran off.

Mitchell testified that he first spoke to police officers at the hospital, where he spent five days in treatment for the four gunshot wounds he had received. Using the nicknames he knew them by, he told detectives that "Boogie" (Baugh), "Damian Jackson" (Owes), and "Monte" (Crenshaw), had been three of the four men who had attacked him. He admitted that he had used the wrong last name for Owes. In addition to their names, he provided police with a physical description of the defendants. About a week after he was released from the hospital, he identified all three defendants from a series of photographs in a photographic lineup.

Mitchell testified that he was certain that the bandana worn by Baugh had been dark blue and white. He said he had not provided descriptions of the clothing worn by Baugh and Owes in the preliminary hearing because no one had asked that question, and he had been instructed to answer only the questions he was asked. He did not remember if he had initially told police officers if all three defendants had taken their masks off, or if he had only told them that "Monte" had. He insisted, however, that all three, at some point during the episode, had removed their masks. When asked why Pritchard, his mother, and his brother had not seen any of the men unmasked, he explained that it might have been because they were forced to lie with their faces down against the floor. He stated that he had not called any of the defendants by name because he had not wanted them to realize that he recognized who they were.

Mitchell admitted that the police vice squad had raided the 12th Avenue residence two days prior to the incident of November 12. He claimed, however, that he had already moved out of the house by that time, and denied having ever told anyone that the defendants had "snitched" on him, and that he was blaming them for the instant offenses in order to pay them back. He had identified the three defendants from the very beginning, and had never named the fourth man because he had

not recognized him. He denied that the State had offered him any deals in exchange for his testimony in the case.

Two officers assigned to the Identification Section of the Metropolitan Nashville Police Department testified regarding their investigation of the crime scenes. Officer George Bouton, who had reported to the Vance Avenue address, identified photographs of Ms. Mitchell's house showing the front door that appeared to have been forced open, the rooms in disarray, and what appeared to be blood on the floor and carpet. He had not attempted to take fingerprints because the crime victims had reported that the perpetrators wore gloves. No spent bullet casings had been discovered at the scene. Officer Thomas Simpkins, who investigated and photographed the 12th Avenue house, testified that he had processed the scene for latent fingerprints, but had been unable to obtain any. He stated that the furniture in the house had been turned over, and items in the house appeared to have been moved around. He had discovered blood in the utility room, but had not found any spent bullet casings.

Detective Thomas Bowden testified that he conducted a five- to ten-minute interview of Mario Mitchell in the early morning of November 12, 1998, at the emergency department of Vanderbilt Hospital, while Mitchell was receiving treatment for his gunshot wounds. Mitchell briefly described what had occurred, and said that he had recognized three of his attackers. In addition to providing a physical description of these men, he also gave Bowden the nicknames by which he knew them. According to Bowden's notes, Mitchell told him that "Damian" was five feet eight, 160 pounds, and had gold teeth in the front with the number "12" on one tooth. He said that the individual he knew as "Little Boogie" was about five feet eight, 180 pounds, and had braided hair and gold teeth on the top and bottom. A third individual, whom he knew as "Monte," was five feet ten, 170 pounds, and had braided hair and some gold teeth. He had not provided a description or name for the fourth individual.

Bowden testified that Mitchell told him that "three or four" of the men were wearing masks. Mitchell also told him, initially, that "three or four" men were involved in the attack. Later in the interview, however, he told him that there was a fourth suspect whom he did not know. Bowden had nothing in his notes to indicate that Mitchell had mentioned anything about a bandana, or that he had told him that any of the men had taken off their masks. Mitchell had told him that he had known each of the three men for several years, and that he had recognized their voices. He had not described their clothing.

Hazel Jackson, Marquez Crenshaw's mother, testified that she had been informed by the police some time between 8:00 and 9:00 a.m. on November 12, 1998, that her blue 1983 Oldsmobile Cutlass had been used in a robbery, and that the car had been discovered at the home of Crenshaw's grandfather. She identified her son's co-defendants as men with whom she was familiar. Baugh, she said, was a friend of her son's, while Owes was an "acquaintance."

Homicide Detective Robert McDavis of the Metropolitan Police Department testified that on November 13, 1998, during the course of his duties, he had had occasion to come into contact

with both Leonard Baugh and Damian Owes at the same location. Detective McDavis said that he was familiar with Baugh's nickname of "Boogie," and that he had personally observed the number "12," inscribed into Owes's front gold teeth.[3] During the course of a conversation, Owes told him that he and Baugh were half-brothers. Detective McDavis identified Baugh and Owes in court.

Detective James Arendall of the Metropolitan Police Department testified that on November 17, 1998, he had shown Mario Mitchell a set of four photographic lineups, each set containing six photographs. From these photographs, Mitchell had positively identified all three defendants. Mitchell had told him that one of the men had pulled his mask off and that he had recognized him, but had not told him which man it had been. He had not indicated that he had seen either of the other two men without their masks. Mitchell had told him that he had been able to identify the defendants by their voices and their clothing.

On December 30, 1998, as part of his continuing investigation of the case, Detective Arendall and other officers went to a house on Old Matthews Road. Inside the house, they discovered several guns, including a .357 Magnum, two bandanas, including a dark blue one with a white design, as well as Leonard Baugh, who was hiding in the attic. After approximately fifteen minutes of calling for him to come down, and after threatening to send the canine unit up after him, Baugh emerged, unarmed. No weapons were discovered in the attic. Arendall testified that he had also participated in the November 12, 1998, recovery of Mitchell's Chevrolet Blazer. The Blazer had been discovered at the same location as Hazel Jackson's vehicle.

On cross-examination, Arendall acknowledged that when Mitchell picked Crenshaw's photograph out of the lineup, he had said, "That's him, Crenshaw. I believe he shot me," and that as he picked Leonard Baugh's photograph he had said, "Him, Leonard Baugh. He shot me the first two times." He admitted that Baugh had not been armed when he was discovered in the attic of the house on Old Matthews Road, and that he had not claimed ownership of any of the weapons in the house.

The State's motion to dismiss the aggravated assault charges against the defendants, based on its failure to locate a necessary witness, was granted, and the State rested its case. The defendants rested their cases without the presentation of any proof. Following deliberations, the jury found all three defendants guilty of one count of especially aggravated robbery, five counts of especially aggravated kidnapping, and one count of aggravated burglary. The jury also found Leonard Baugh guilty of the unlawful possession of a firearm by a felon, and not guilty of resisting arrest. Following the denial of their motions for a new trial, each defendant filed a timely appeal to this court.

## ANALYSIS

---

[3] At the conclusion of the State's presentation of proof, all three defendants were required to stand before the jury and display their teeth. However, there is nothing in the record to indicate what that display revealed.

On appeal, each defendant challenges the sufficiency of the convicting evidence. More specifically, all three defendants contend that the evidence presented at trial was insufficient to establish their identify as the perpetrators of the crimes. They point to inconsistencies in the various descriptions of the attackers provided by the victims, as well as inconsistencies in Mario Mitchell's trial testimony from earlier accounts that he provided to the police. Observing that the credibility of a witness and the weight to be given inconsistent testimony is a matter for the jury to determine, the State argues that Mitchell's direct identification of the defendants, combined with circumstantial evidence linking them to the crimes, was sufficient evidence from which a rational trier of fact could find the defendants guilty of the crimes beyond a reasonable doubt.

**Standard of Review**

When the sufficiency of the convicting evidence is challenged on appeal, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved not by this court, but by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court may not reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 855. Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Grace, 493 S.W.2d at 476.

### Sufficiency of the Evidence in Support of the Defendants' Identity

In the light most favorable to the State, the evidence was sufficient to establish beyond a reasonable doubt the three defendants as the perpetrators of the crimes. The identity of an accused may be established by either direct evidence, circumstantial evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury to determine, after consideration of all the evidence. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Regarding the identity of an accused, "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citation omitted). In his initial statements to police, including the first statement given while he was still in the emergency room receiving treatment for his gunshot wounds, Mario Mitchell unequivocally identified "Boogie," "Damian," and "Monte" as three of the men involved. At that time, he provided physical descriptions of the defendants. Later, he picked their photographs out of a series of photographs shown him by Detective Arendall. He did not identify the fourth man, and consistently told police that he had not recognized that individual.

Mario Mitchell testified at trial that he first recognized Baugh by his distinctive voice and by seeing him in the same clothing he had worn when they chatted on the street earlier in the evening, and that he later briefly saw his face. He testified that he recognized Crenshaw and Owes by their voices and clothing, and by seeing their faces when they took off their masks. Ms. Mitchell testified that one of the men had gold teeth with the number "12" inscribed on them. Mario Mitchell and Detective McDavis both testified that Owes had a "12" in his gold front teeth. Michael Pritchard saw a large black car following Mario's jeep as the men took Mario from the house. Crenshaw's mother's blue Cutlass was stolen on the night of November 11, 1998, and discovered the next day in the backyard of Crenshaw's grandfather's house, where Mario's truck was also located.

The defendants are correct in their observations that the victims' accounts of the episode differed in some details,[4] and that Mario Mitchell's testimony at trial that he had seen all three defendants with their masks off conflicted with earlier accounts he had given police. However, the credibility of witnesses, the weight to be afforded their testimony, and the reconciliation of conflicts in the evidence, are matters entrusted to the jury, as the trier of fact. State v. Anderson, 880 S.W.2d

---

[4]Among the discrepancies cited are the following: Ms. Mitchell testified that all four men wore "leather-type" masks, that her bedroom light was off, and that the bathroom light was on; Michael Pritchard said that the bathroom light was off, that three men wore ski masks, and that a fourth wore a stocking cap and a bandana, which he believed had been red; Geno Smith testified that the men wore hoods and masks, that one wore a black and white bandana, that the one without the bandana shot Mario, and that the lights in both bedrooms were on; and Mario Mitchell testified that the bandana was dark blue and white, that Baugh, who was wearing the bandana, shot him, and that every light in the house was on.

720, 726 (Tenn. Crim. App. 1994) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). All four victims testified that they were asleep when four armed, masked men broke into their home in the early morning hours, tied them up, ransacked the home, shot Mario in the legs, and carried him from the house. Ms. Mitchell and Michael Pritchard both said that they were terrified, with Ms. Mitchell admitting that some things were confused, because the men had been "moving so fast and doing things so quick." In light of these circumstances, it is not surprising that some details of the victims' accounts varied.

The defendants argue that Mario Mitchell's identification of them is unreliable, given the inconsistencies in his testimony. We disagree. Mitchell testified that he was familiar with all three defendants, that he had regular casual contact with them in his neighborhood as often as four or five times a week, and that he knew their voices. Thus, there was evidence from which the jury could determine that he would have been able, as he testified, to recognize the defendants by their voices. See State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1999) ("The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made."). In addition, although the evidence showed that Mitchell had not reported this fact in his initial interviews with the police, he also testified that all three defendants removed their masks, and that he recognized their faces. Inaccuracies and inconsistencies in a witness's testimony are questions for the jury to consider when determining what weight to be given a witness's testimony. Id. The jury's decision to accredit testimony of a witness in spite of obvious inconsistencies will not be disturbed by this court on appeal unless those "inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt" of the defendant's guilt. Id. In this case, although conflicting and inconsistent testimony was presented at trial, these inconsistencies were not so improbable or unsatisfactory that they created a reasonable doubt of the defendants' guilt. It was within the province of the jury to resolve these conflicts and inconsistencies, and to accredit Mitchell's testimony identifying the defendants as the perpetrators of the crimes. In sum, we conclude that the evidence was sufficient to support the defendants' convictions.

In our review of the record on appeal, we determined, although not raised as an issue, that two of the judgments are either incorrect or that material information was omitted. The judgment for No. 99-C-1934, Count 1, as to Leonard E. Baugh, Jr., incorrectly states that especially aggravated robbery, of which he was convicted, is a Class "B" felony. An amended judgment should be entered stating that it is a Class "A" felony. Additionally, the judgment for No. 99-C-1934, Count 3, as to Damian Lamar Owes, does not list the offense of which he was convicted. An amended judgment should be entered setting out the conviction offense. This matter is remanded to the trial court for entry of these two amended judgments. In all other respects, the judgments are affirmed.

## CONCLUSION

After a thorough review, we conclude that the evidence was sufficient to support the defendants' convictions beyond a reasonable doubt. The judgments of the trial court are affirmed. The matters are remanded to the trial court for corrections of the judgments, as set out herein.

-11-

_____
ALAN E. GLENN, JUDGE