IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 12, 2002

## STATE OF TENNESSEE v. ALBERT YARBROUGH

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-04357     Bernie Weinman, Judge**

---

**No. W2001-01150-CCA-R3-CD - Filed April 12, 2002**

---

The defendant was convicted by a Shelby County Criminal Court jury of rape, a Class B felony, and sentenced by the trial court to fourteen years, at 100% as a violent offender, in the Tennessee Department of Correction.  The sole issue he presents on appeal is whether the evidence was sufficient to support his conviction.  Based upon our review of the record, we conclude that the evidence was sufficient for a rational trier of fact to find him guilty of the offense beyond a reasonable doubt.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

A C Wharton, Jr., Shelby County Public Defender; Garland Ergüden, Assistant Public Defender (on appeal); and Teresa Jones, Assistant Public Defender (at trial), for the appellant, Albert Yarbrough.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and Camille McMullen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On April 25, 2000, the Shelby County Grand Jury returned an indictment against the defendant, Albert Yarbrough, charging him with the April 29, 1999, rape of the victim, Lisa Cunningham.  At the defendant's trial, held March 20-22, 2001, the victim testified that she was walking home from a convenience store near the corner of Mississippi and Crump Boulevards in Memphis at about 3:30 a.m. on April 29, 1999, when a man she had never seen before "hopped out from behind [her]," grabbed her, and threw her into some bushes.  She said that the man hit her "real hard," knocking her to the ground and one of her front teeth out of her mouth, "dived down" on top

of her, and then fought to remove her clothing. She testified that she struggled and resisted for approximately twenty minutes, managing to kick him and stab him once or twice in the back with a short knife she carried in her back pocket. She said that she knew she stuck him with the knife, but "it couldn't have been very hard because he kept doing what he was doing." She stated that when she stuck him, the man said, "Oh, bitch, you – you tough, you tough, you're a tough bitch, you're a tough bitch," and twisted her arm hard, forcing her to relinquish the knife.

The victim testified that she pleaded with the man not to kill her. She said that he told her, "Shut up, bitch, just lay down and take it," and she lay back, still begging for her life. He then penetrated her with his penis. Although she did not see his penis, she could feel that he was not wearing a condom. She estimated that the actual intercourse lasted ten minutes and said that she felt the man ejaculate inside of her. After he had completed the act, the man "got up just as normal like [ ] nothing happened" and walked off. Because she had seen some fire trucks up the street, she got up and followed him, yelling in an effort to attract the firefighters' attention. However, when the man turned around and said, "Oh, you want to follow me, huh? Go on before I get you again," she stopped following him, ran home, and telephoned the police.

Approximately two and a half months later, the victim saw the defendant walking in the same area in which she had been attacked and immediately recognized him as the man who had raped her. She said that she flagged down a police officer, who caused the defendant to be apprehended and arrested. The victim testified that she recognized the defendant by his "puffed" eyes and his distinctive gait, explaining that he walked with a "bounce" or a limp to his step. She later picked the defendant out of a photographic lineup, circling his photograph and writing, "This is the person that rape[d] me." The photographic spreadsheet, which included the date "7/14/99" and the victim's signature, was introduced as an exhibit and published to the jury.

The victim acknowledged that the lighting in the area where she was raped was not good, and that she had not been shown a photographic lineup until after she had recognized the defendant on the street in July. Nonetheless, she was absolutely confident that the defendant was the man who had raped her and had no doubt that she would have been able to recognize his photograph at any time. She testified that she had ample opportunity and "couldn't help but to see" the defendant in the long struggle during the attack. The victim made a positive courtroom identification of the defendant as her rapist.

Lieutenant Joe Hackney of the Memphis Police Department testified that the victim was bleeding from her mouth and had dirt and grass on her clothing and in her hair, when he responded to the call at her apartment shortly after the attack. He said she "had been obviously in a struggle." After an ambulance arrived, he went to an overgrown area "on Crump Boulevard right at the railroad tracks east of Mississippi" where he found "a trampled down area" in the middle of some high grass, consistent with the victim's account of the place where she had been attacked. Reading from the police report of the incident, Lieutenant Hackney testified that the victim described her rapist as

> A male black, five-nine, 30 to 40 years old, had on a dark blue Fed Ex shirt, light blue jeans, black hat, thin beard, clean-shaven, light complexion, offensive speech, faded hairstyle, conservative appearance, short hair, medium voice and angry demeanor.

He acknowledged that the victim's description included two different types of hairstyle, as well as information that the rapist wore a hat. He also acknowledged that the area in which the attack occurred was dark and covered with waist-high bushes and grass. He indicated, however, that the victim had been emotionally distraught at the time she provided her description of the rapist, and testified that there were lights near the location where the rape occurred "up on the railroad bridge."

Margaret Aiken, a nurse clinician at the Memphis Sexual Assault Resource Center, testified that she examined the victim at 7:00 a.m. on April 29, 1999. Among the evidence she collected was a blood sample, saliva swabs, pubic hair, the victim's underpants, and vaginal swabs, the latter of which revealed the presence of sperm in the victim's vagina. Aiken testified that her standard procedure is to meticulously label, package, and place the evidence she collects into a locked storage room at the facility, from which it is then sent to the Tennessee Bureau of Investigation ("TBI") for analysis. She had no personal knowledge of the procedure used to transport evidence from the locked storage room to the TBI laboratory.

Sally DiScenza, a forensic sexual assault nurse examiner employed at the Memphis Sexual Assault Resource Center, testified that she utilized standard procedures to collect a sample of the defendant's blood for evidence on July 14, 1999. She explained that standard procedure entails taking the suspect's photograph and fingerprints and asking for identification and signature to ensure identity; drawing blood using a sterile needle and a blood collection tube; placing the blood onto a sterile blotter or "blood standard card" labeled with the suspect's name; sealing the blood standard card into an evidence envelope containing the suspect's name, the date and time, and her signature; and then sealing that envelope into a larger envelope or "master suspect kit" containing the suspect's name and her signature across the seal of the envelope. DiScenza testified that she placed the sealed master suspect kit containing the defendant's blood sample in the locked evidence room of the Memphis Sexual Assault Resource Center, from which it was then sent to the TBI. She said that someone affiliated with the Memphis Sexual Assault Resource Center and the Memphis Police Department was responsible for sending the suspect kits to the TBI for analysis, and that she had no further contact with the evidence after placing it in the locked evidence room.

Chad B. Johnson of the TBI, who was accepted by the court as an expert witness in the field of serology and DNA analysis, testified that he received, among other evidence in the case, blood standards from the victim and the defendant and vaginal swabs and slides from the victim. He first isolated and analyzed the victim's and the defendant's DNA from their respective blood samples, developing a DNA profile for each. He then isolated a mixture of genetic material, containing sperm and epithelial cells, from the victim's vaginal slide and performed DNA analysis on the mixture. His DNA analysis revealed that the genetic material from the victim's vaginal slide was consistent with the DNA profiles of the victim and the defendant, indicating the presence of the defendant's

sperm mixed with epithelial cells from the victim's vagina. Johnson testified that he used a database and program developed by the Federal Bureau of Investigation to determine that the statistical probability of someone else having the same DNA profile as the defendant was one in 130 million individuals in the African-American population, and one in 69 million individuals in the Caucasian population. On cross-examination, he testified that the evidence was shipped to him by Federal Express, and acknowledged that he had no personal knowledge of the manner in which it had been collected.

Memphis Police Department Patrol Officer Michael Tullos testified that he was driving down Crump Boulevard on the afternoon of July 7, 1999, when the victim waved him down and told him that she had been raped a couple of months earlier and had just seen the man who had raped her walking down Porter Street toward Alston. Officer Tullos said that he obtained a description of the suspect from the victim, verified through dispatch that the victim had filed a rape report, and then drove in the direction the victim indicated the suspect had gone. He said that he located the suspect one or two blocks away, detained him, and brought him back to the victim, who positively identified him as her rapist. Officer Tullos identified the defendant as the man he had arrested.

As its final witness, the State recalled Sally DiScenza to the stand, who identified the defendant as the man from whom she took blood on July 14, 1999. DiScenza revealed on cross-examination that she had placed a sample of the defendant's pubic hair in the master suspect kit, along with his blood standard card. She explained that, if she had not mentioned the pubic hair sample in her earlier testimony, it was only because she had not been asked about it. She testified that she placed the blood standard and the pubic hair sample together in the same master suspect kit, sealed the envelope with evidence tape, placed her signature across the sealed label, and locked the kit in the evidence room of the Memphis Sexual Assault Resource Center.

The defendant elected not to testify and rested his case without the presentation of any proof.

## ANALYSIS

### Sufficiency of the Evidence

The sole issue the defendant presents on appeal is whether the evidence was sufficient to support his conviction. Specifically, he contends that the victim's identification of him is unreliable, and that the State failed to establish the proper chain of custody for introduction of the DNA evidence at trial. The State responds by arguing that the chain of custody of the DNA evidence was reasonably established, and that the jury was entitled to accredit the victim's identification of the defendant as her rapist.

When the sufficiency of the convicting evidence is raised as an issue on appeal, this court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See

also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the defendant guilty of raping the victim beyond a reasonable doubt. The identity of an accused may be established by either direct evidence, circumstantial evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury to consider based upon a consideration of all the evidence. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). With regard to the identity of an accused, "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citation omitted). Here, the victim positively and unequivocally identified the defendant as her rapist, not only at the time of his arrest, but also in the courtroom during his trial. She remained steadfast, throughout her direct and cross-examination testimony, that she had had sufficient opportunity to view her attacker during the rape, that she immediately recognized the defendant as her rapist when she passed him on the street in July, and that she could have recognized him at any time after the rape. Officer Tullos testified that the victim told him, when she flagged down his patrol car, that she had just seen the man who had raped her. He said that the victim's description led him to the defendant, and that when he brought the defendant back to the victim, she affirmed that he was the man who had attacked and raped her. Additionally, the victim later picked the defendant out of a photographic lineup, once again identifying him as her rapist.

As support for his contention that the victim's identification of him is unreliable, the defendant points to the inconsistencies in the victim's original description of her attacker, evidence that the area in which she was raped was dark, and her testimony that the night of April 29, 2000, was the first time she had ever seen her rapist. He also observes that the victim did not mention anything about her attacker's "puffed" eyes or limping gait in her original statement to police. The victim maintained throughout her testimony, however, that she was able to see the defendant in the estimated thirty minutes that elapsed during the attack, much of which was spent with him facing her as he lay on top of her, fighting to remove her clothing and penetrate her with his penis. Moreover, she testified that there were some street lights in the area, and that she followed the defendant as he walked down the street after the rape, until he turned around and threatened to "get her" again if she did not cease following. Lieutenant Hackney testified that, although the immediate area of the rape was dark, there were lights on the railroad bridge near the area in which the rape

occurred. Thus, there was evidence from which the jury could have found that the victim had the opportunity to see her rapist, either during or immediately after she was attacked, and from which it could have reasonably accredited her identification of the defendant as her rapist. See State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1999) ("The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made.").

As for the discrepancies in the victim's description of the defendant on the night of the rape, and her failure to report his "puffed" eyes or distinctive gait, the jury could have reasonably concluded that these inconsistencies and oversights were the result of her emotional state, rather than uncertainty about the defendant's identity. Lieutenant Hackney testified that the victim was nervous and crying at the time she gave her statement to police. In light of her distraught state, it is hardly surprising that some details of her description varied. Nor is it surprising that she neglected to mention the defendant's eyes or distinctive walk, or perhaps even failed to remember these traits, until after she had later seen the defendant walking down the street. The jury's decision to accredit testimony of a witness in spite of obvious inconsistencies will not be disturbed by this court on appeal unless those "inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt" of the defendant's guilt. Id. The defendant's presentence report, indicating that he is 5'8" in height and was 40 years old at the time of the rape, demonstrates that although the victim may have provided some inconsistent details about the defendant's hairstyle or clothing, she was remarkably accurate in other descriptive details she provided in her initial report. In sum, we conclude that the evidence cited by the defendant was insufficient to show that the victim's identification testimony was unreliable.

The defendant also contends that the State failed to establish an unbroken chain of custody for the introduction of the DNA evidence. He argues that the evidence should not have been admitted because of the State's failure to present proof of who shipped it from the evidence room at the Memphis Sexual Assault Resource Center and who received it at the TBI laboratory in Jackson. The State contends that the chain of custody was reasonably established, and that the trial court did not abuse its discretion in admitting the DNA evidence at trial. We agree with the State.

In order for tangible evidence to be presented at trial, the State must either introduce a witness who is able to identify the evidence, or establish an unbroken chain of custody. State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (citations omitted). The purpose of the chain of custody is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Id. (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, the State is not required to establish facts that exclude any possibility of tampering; reasonable, rather than absolute, assurance as to the identity and integrity of the evidence is all that is required. Id. (citations omitted). Whether or not the chain of custody has been sufficiently established lies within the sound discretion of the trial court, and the trial court's determination will not be reversed on appeal absent a showing of abuse of discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984).

Our review reveals no abuse of discretion by the trial court in this matter. The trial court found that although the chain of custody could have been "done more clearly[,]" the State's proof was sufficient to warrant the admission of the DNA evidence at trial. We agree. "[E]vidence may be admitted when the circumstances surrounding the evidence *reasonably establish* the identity of the evidence and its integrity." Scott, 33 S.W.3d at 760 (emphasis added) (citing State v. Holloman, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992)). Both Margaret Aiken and Sally DiScenza testified that they followed standard, sterile procedures in collecting the evidence from the victim and the defendant, sealing the evidence into envelopes, and placing the labeled and sealed envelopes in the locked evidence room of the Memphis Sexual Assault Resource Center. Both testified that evidence envelopes from the locked storage room were routinely sent to the TBI laboratory for analysis, although neither was personally involved in the shipment or transport of the evidence to the laboratory. Chad Johnson testified that the evidence arrived to him at the TBI laboratory, via Federal Express, packaged in two separate evidence envelopes, with smaller envelopes inside. One kit was labeled with the defendant's name, and the other with the victim's name. Although Johnson was never asked if the envelopes were sealed when he received them, and as a consequence never directly testified that they were, he indicated that the laboratory routinely receives suspect kits from law enforcement agencies, and that there was nothing about these envelopes that caused him to question their origin, packaging, or labeling. The defendant does not cite anything in the record to suggest that the envelopes were tampered with or altered between the time that Aiken and DiScenza placed them in the locked evidence room and they arrived at the TBI. Thus, we conclude that the circumstances establish with reasonable assurance the identity and integrity of the evidence at issue. See id. ("the State is not required to establish facts which exclude every possibility of tampering") (citing State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987)).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE