IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
MAY SESSION, 1999

FILED

July 15, 1999

Cecil W. Crowson
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | |
| | ) | No. 01C01-9803-CR-00113 |
| Appellee | ) | |
| | ) | DAVIDSON COUNTY |
| vs. | ) | |
| | ) | Hon. Cheryl Blackburn, Judge |
| COREY LAMONT RADLEY, | ) | |
| | ) | (First Degree Murder) |
| Appellant | ) | |

For the Appellant:

**Richard McGee**
Attorney for Appellant
601 Woodland Street
Nashville, TN 37206

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Marvin E. Clements, Jr.**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

**Victor S. (Torry) Johnson III**
District Attorney General

**Roger Moore**
Asst. District Attorney General
Washington Square, Suite 500
222-2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED: _____

AFFIRMED

**David G. Hayes**
Judge

**OPINION**

The appellant, Corey Lamont Radley, was convicted by a jury in the Criminal Court of Davidson County of first degree murder and was sentenced to life imprisonment. On appeal, the appellant raises the single issue of the sufficiency of the convicting evidence, specifically challenging the identification testimony of the State's sole witness to the murder.[1]

**BACKGROUND**

Around 5:00 p.m. on October 22, 1996, twenty-year old Keith Leatherwood arrived at the residence of his cousin, Chante Jenkins, on Grace Street in Nashville. Ms. Jenkins and Leatherwood entered the residence while an individual named Joe Brown remained in the vehicle. Leatherwood and Ms. Jenkins had a "close relationship" and it was not uncommon for Leatherwood to routinely visit his cousin. On this occasion, Leatherwood informed Ms. Jenkins that he had arranged to meet "Hank," also known as "Rabbit," across the street from her residence near the park. Several months previous, Leatherwood, while visiting with Ms. Jenkins, had pointed out "Rabbit," who was standing across the street.

After several minutes, Leatherwood left the residence while Ms. Jenkins continued to watch him from her kitchen window. Although security bars were attached to the window, she testified that her view was unobstructed. She watched Leatherwood as he walked up the sidewalk and crossed over into the street near the park where he was joined by two other individuals. Ms. Jenkins estimated the distance between her vantage point and the men as a distance equivalent to the

---

[1]The appellant's issue is framed as error by the trial court ". . . in Denying Defendant's Motion for Judgment of Acquittal Pursuant to Tennessee Rules Criminal Procedures 29(c). As There Clearly Was Insufficient Evidence To Justify The Verdict Of The Jury In This Case." This issue thus encompasses appellate review pursuant to Tenn. R. App. P. 13(e).

2

corner of the courtroom.  That distance was later determined to be fifty feet.

Leatherwood and the two men stood together for a few seconds and then Ms. Jenkins saw Leatherwood, whose back was toward her, turn and run.  As he began to run in the direction of Ms. Jenkins' house, one of the men pulled out a dark handgun and started shooting.  Ms. Jenkins then saw Leatherwood fall to the ground onto the sidewalk.  More gunshots were heard.  She estimated the total number of gunshots at ten or more.  Ms. Jenkins ran outside and then went to her neighbor's house to call 911.  Subsequently, she went to her grandmother's house to inform her that Leatherwood had been shot.  When she returned, the police and paramedics had arrived on the scene.

At the police station just hours after the shooting, Ms. Jenkins told the officers that the victim was meeting "Rabbit."  She told them that the person who shot her cousin was wearing a black hooded sweatshirt with the hood pulled over his head and black pants.  Ms. Jenkins identified the appellant from a photographic lineup as the person who shot the victim.[2]  Ms. Jenkins further advised the officers,  "I've seen him before, I've seen his face."  Moreover, at trial, Ms. Jenkins made an in-court identification of the appellant, testifying that she had gotten a good look at the face of the person who shot her cousin.

On cross-examination, Ms. Jenkins stated that she could not identify the person accompanying the appellant.  Although she testified earlier that it was light and clear around 5 p.m., she admitted that after the shooting it became dark and rainy.  She explained that it was clear enough to see the appellant.  Although she could not remember any facial hair or describe his face, she was certain the appellant was the shooter.  She admitted that it was only a matter of seconds which

_____

[2]A Metro detective testified at trial that based upon the nickname "Rabbit," provided to him by Ms. Jenkins, a photographic array was prepared.

3

she had to view the appellant and that she was very emotionally disturbed; however, she remained confident in her identification of the appellant.

Damien Huggins, a Metro Police officer, responded to a call regarding a shooting on Grace Street within two to three minutes. The officer stated that around 5 p.m. that it was still daytime and the rain was only drizzling. The rain became harder toward the end of the investigation. The police preserved the scene and marked the location of four .45 caliber shell casings found in the street. Police testimony also revealed that, because of inclement weather which included rain and strong wind gusts, the shell casings could have been moved before their arrival. No weapon was ever recovered.

Bruce Levy, medical examiner for Davidson County, testified that the autopsy revealed that the victim sustained multiple gunshot wounds to the chest, abdomen, back, arms, and legs, resulting in internal bleeding and injury to vital organs. The medical examiner stated that some of the gunshot wounds were superficial; however, since the victim died from a loss of blood, each wound contributed to his death. The victim exhibited no traces of any intoxicants in his system. The examiner concluded that between eight and twelve bullets struck the victim.

As the sole defense witness, Robert Burford, a private investigator prepared a diagram for the trial indicating certain distances in accordance with the officers' measurements taken from the scene and from the testimony of Ms. Jenkins. Burford measured the distances from the various shell casings to the kitchen window where Ms. Jenkins was standing. He testified that the distance from the first shell casing to the window was 118 feet; the second, 109 feet; the third, 103 feet; and the fourth, 67 feet. Burford explained, that from Jenkins earlier testimony, that he had measured the distance to the corner of the courtroom at only 50 feet.

Also, Burford made photographs inside the house from the kitchen window. Positioning a person to the left of shell casing number two, he concluded that only the right arm and shoulder of the assailant were visible from the window and not the face of the individual firing the gun. He stated that it was impossible to see the shooter from the vantage point of the kitchen window relative to the other shell casings. He further provided that the street sloped in a west-to-east direction. On cross-examination, he testified that all of his photographs were taken from a stationary vantage point at the window without any movement.

## ANALYSIS

The appellant contends that the State failed to prove him guilty of murder beyond a reasonable doubt. In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused. State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995); see generally, State v. Demarco Bowdery, No. 02C01-9705-CR-00173 (Tenn. Crim. App. at Jackson, Jan. 29, 1998), perm. to appeal denied, (Tenn. Oct. 12, 1998). In this case, the appellant argues that the testimony of the State's only witness linking the appellant to the commission of the crime, Chante Jenkins, was not credible and that her identification of him was totally unreliable.

It is undisputed that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 2789 (1979); In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970). The relevant question upon a sufficiency review of a criminal conviction, be it in the trial court or an appellate court, is whether, "after viewing the evidence in the light most favorable

to the prosecution,[3] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. at 319, 99 S.Ct. at 2789. See also Tenn. R. App. P. 13(e); Tenn. R. Crim. P. 29(a). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). With these principles of appellate review in hand, we proceed with an examination of the appellant's sufficiency challenge.

The appellant argues that under the dictates of Jackson v. Virginia, 443 U.S. at 307, 99 S.Ct. at 2781, "no rational trier of fact could have reached the conclusion that the prosecution established beyond a reasonable doubt the identity" of the appellant. He contends the following grounds overwhelmingly establish that the testimony of Ms. Jenkins, the State's eyewitness, was unreliable:

> (1) virtual impossibility to view the shooter from her kitchen window from the location of the first shell casing;[4]
> (2) failure of witness to recall the appellant's facial hair;
> (3) the exact words of the witness when identifying the appellant at the photographic lineup, i.e., "I've seen him before. I've seen his face;"
> (4) the short span of time she viewed the shooter;
> (5) witness' failure to adequately determine the distance from her vantage point to the shooter;
> (6) the emotional state of the witness;
> (7) the bias of the witness;
> (8) the unfamiliarity of the witness with the appellant;

---

[3]This standard preserves the factfinder's role as the weigher of the evidence. See State v. Elder, 982 S.W.2d 871, 877 (Tenn. Crim. App. 1998).

[4]While we recognize the physical facts rule allows this court in our sufficiency review to disregard the testimony of witnesses unable to be reconciled with the physical evidence, see State v. Hornsby, 858 S.W.2d 892, 894-895 (Tenn. 1993), this case does not present us with this issue. In order for us to disregard the challenged testimony, the physical facts must be "well-established and universally recognized physical laws." Nelms v. Tennessee Farmers Mut. Ins. Co., 613 S.W.2d 481, 483 (Tenn. App. 1978). However, in the present case, we are prevented from applying the physical facts rule because its application would be dependent upon assumptions or calculations in the determination of distance. See Waller v. Morgan, 133 S.W.2d 614, 616 (Tenn. App. 1939). Both the State and defense witnesses testified as to the uncertainty related to the location of the various shell casings due to the windstorm. In addition, the positioning of the shooter and the location of vehicle were also based upon extrapolations. Furthermore, we are called upon to contend with the viewpoint of a static camera as opposed to movement in relation to the human body. Thus, we are unable to apply the physical facts rule.

(9) the witness mischaracterization of the weather conditions;
(10) the expectation of the witness after the victim told her he was meeting "Rabbit;" and
(11) unconscious transference.[5]

At trial, Chante Jenkins testified that she got a good look at the face of the person who shot her cousin. Although she testified that she observed the shooter from her kitchen window from a distance of approximately fifty feet her identification testimony remained firm. Ms. Jenkins testified that during this encounter, she was in a position to observe the appellant and the second person, "when [Leatherwood] was walking up towards them. I was watching where he was going;" then as she saw the two men approaching Leatherwood, they had their "fronts" to her. . . . "They stood there together." . . . then she related that she could see the appellant's "lips moving" but could not hear anything and, several seconds later, she "saw Keith turn and run."

With reference to the appellant's arguments involving unconscious transference, the appellant's unfamiliarity of the witness, her statement, "I've seen him before. I've seen his face" and her expectation of meeting "Rabbit," the following relevant portions of Ms. Jenkins' testimony were introduced:

> Q. Okay. Now I guess my question, and I need to back up, is as your cousin was walking out meeting the two individuals, at what point did you recognize one of the individuals as being Rabbit?

---

[5]Although the appellant supplements his brief with an article regarding the concept of unconscious transference, arguments of counsel are not considered as evidence. See State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). The appellant's brief denotes that "unconscious transference occurs when an eyewitness to a crime misidentifies a familiar but innocent person from a police line-up," citing to an article by David F. Ross et al., Unconscious Transference and Mistaken Identity: When a Witness Misidentified a Familiar but Innocent Person., J. of Applied Psychol. 79, No. 6: 918 (1994). This article also contains the following statement:
> In summary, the literature provides mixed and somewhat weak support for unconscious transference. It tends to occur only if bystanders are seen as familiar; but not so familiar that witnesses recall specific contextual cues that disambiguate them from the assailant. Moreover, in the few studies that do report an unconscious transference effect, it is not clear how or why it occurs.
Id. at 919.

7

A. I didn't.

Q. When you saw the two individuals whom you have described or told us about walking up to meet your cousin, at what point, if at all, did you realize, or did you realize you had seen that person before?

A. When I saw the person, I didn't realize it was who he said he was going to meet until when I came downtown and gave my statement, and they asked me to pick out the picture, and I picked it out, and still, at that point, I didn't know who it was. Even when they told me his name, I didn't know who it was until the newspaper printing (sic) it the next day.

On cross-examination, Ms. Jenkins testified:

A. I picked the person that I saw that day.

Q. Well, you picked out the picture of a face that you had previously been told was the face of a man named Rabbit; is that correct?

A. I picked out the picture of the person I saw that evening.

The proof also established that, after Ms. Jenkins had identified the appellant from the police photo line-up, she remarked, "I've seen him before. I've seen his face." Although, perhaps more than one inference could have been drawn from this proof, clearly a rational juror could properly infer that the witness' identification of the appellant was based upon her observation of the shooter on the afternoon of October 22 and not from a prior occasion. It was only after she had identified the appellant from the police line-up that she also recalled "I've seen him before. I've seen his face." In a criminal case, if more than one reasonable inference can be drawn from the evidence, then on appellate review, we are required to apply that inference most favorable to the State. Tenn. R. App. P. 13(e).

The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. See State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). Inconsistency, inaccuracy and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be

8

given the testimony. <u>See generally</u> <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Further, although inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt. The verdict of the jury in this case is supported by the evidence. The positive identification testimony of the witness, Chante Jenkins, sufficiently supports the appellant's conviction; her testimony is not so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt.

For the foregoing reasons, the judgment of conviction is affirmed.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JERRY L. SMITH, Judge

_____
NORMA MCGEE OGLE, Judge