IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2002 Session

## COREY LAMONT RADLEY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-A-350    Cheryl Blackburn, Judge**

_____

**No. M2001-03066-CCA-R3-PC - Filed September 16, 2002**

_____

In this appeal from the denial of post-conviction relief, the sole issue is whether petitioner was deprived of the effective assistance of counsel in proceedings that led to his conviction for first degree murder with a resulting life sentence. We find no merit to his arguments and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Peter Skeie, Nashville, Tennessee, for the appellant, Corey Lamont Radley.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Petitioner was convicted by a Davidson County jury of first degree murder and sentenced to life imprisonment. The sole issue in his direct appeal to this court was sufficiency of the evidence. This court found the evidence sufficient to support his conviction and affirmed the judgment of the trial court. *See* State v. Radley, 29 S.W.3d 532 (Tenn. Crim. App. 1999). Petitioner timely filed a petition for post-conviction relief which was denied by the trial court. This appeal followed.

### FACTS

We set forth the following facts from our opinion in the direct appeal:

Around 5:00 p.m. on October 22, 1996, twenty-year old Keith Leatherwood arrived at the residence of his cousin, Chante Jenkins, on Grace Street in Nashville. Ms. Jenkins and Leatherwood entered the residence while an individual name Joe Brown remained in the vehicle. Leatherwood and Ms. Jenkins had a "close relationship" and it was not uncommon for Leatherwood to routinely visit his cousin. On this occasion, Leatherwood informed Ms. Jenkins that he had arranged to meet "Hank," also known as "Rabbit," across the street from her residence near the park. Several months previous, Leatherwood, while visiting with Ms. Jenkins, had pointed out "Rabbit," who was standing across the street.

After several minutes, Leatherwood left the residence while Ms. Jenkins continued to watch him from her kitchen window. Although security bars were attached to the window, she testified that her view was unobstructed. She watched Leatherwood as he walked up the sidewalk and crossed over into the street near the park where he was joined by two other individuals. Ms. Jenkins estimated the distance between her vantage point and the men as a distance equivalent to the corner of the courtroom. That distance was later determined to be fifty feet.

Leatherwood and the two men stood together for a few seconds and then Ms. Jenkins saw Leatherwood, whose back was toward her, turn and run. As he began to run in the direction of Ms. Jenkins' house, one of the men pulled out a dark handgun and started shooting. Ms. Jenkins then saw Leatherwood fall to the ground onto the sidewalk. More gunshots were heard. She estimated the total number of gunshots at ten or more. Ms. Jenkins ran outside and then went to her neighbor's house to call 911. Subsequently, she went to her grandmother's house to inform her that Leatherwood had been shot. When she returned, the police and paramedics had arrived on the scene.

At the police station just hours after the shooting, Ms. Jenkins told the officers that the victim was meeting "Rabbit." She told them that the person who shot her cousin was wearing a black hooded sweatshirt with the hood pulled over his head and black pants. Ms. Jenkins identified the appellant from a photographic lineup as the person who shot the victim. Ms. Jenkins further advised the officers, "I've seen him before, I've seen his face." Moreover, at trial, Ms. Jenkins made an in-court identification of the appellant, testifying that

she had gotten a good look at the face of the person who shot her cousin.

On cross-examination, Ms. Jenkins stated that she could not identify the person accompanying the appellant. Although she testified earlier that it was light and clear around 5 p.m., she admitted that after the shooting it became dark and rainy. She explained that it was clear enough to see the appellant. Although she could not remember any facial hair or describe his face, she was certain the appellant was the shooter. She admitted that it was only a matter of seconds which she had to view the appellant and that she was very emotionally disturbed; however, she remained confident in her identification of the appellant.

Damien Huggins, a Metro Police officer, responded to a call regarding a shooting on Grace Street within two to three minutes. The officer stated that around 5 p.m. that it was still daytime and the rain was only drizzling. The rain became harder toward the end of the investigation. The police preserved the scene and marked the location of four .45 caliber shell casings found in the street. Police testimony also revealed that, because of inclement weather which included rain and strong wind gusts, the shell casings could have been moved before their arrival. No weapon was ever recovered.

Bruce Levy, medical examiner for Davidson County, testified that the autopsy revealed that the victim sustained multiple gunshot wounds to the chest, abdomen, back, arms, and legs, resulting in internal bleeding and injury to vital organs. The medical examiner stated that some of the gunshot wounds were superficial; however, since the victim died from a loss of blood, each wound contributed to his death. The victim exhibited no traces of any intoxicants in his system. The examiner concluded that between eight and twelve bullets struck the victim.

As the sole defense witness, Robert Burford, a private investigator, prepared a diagram for the trial indicating certain distances in accordance with the officers' measurements taken from the scene and from the testimony of Ms. Jenkins. Burford measured the distances from the various shell casings to the kitchen window where Ms. Jenkins was standing. He testified that the distance from the first shell casing to the window was 118 feet; the second, 109 feet; the third, 103 feet; and the fourth, 67 feet. Burford explained,

that from Jenkins earlier testimony, that he had measured the distance to the corner of the courtroom at only 50 feet.

Also, Burford made photographs inside the house from the kitchen window.

Positioning a person to the left of shell casing number two, he concluded that only the right arm and shoulder of the assailant were visible from the window and not the face of the individual firing the gun. He stated that it was impossible to see the shooter from the vantage point of the kitchen window relative to the other shell casings. He further provided that the street sloped in a west-to-east direction. On cross-examination, he testified that all of his photographs were taken from a stationary vantage point at the window without any movement.

Radley, 29 S.W.3d at 533-34.

## POST-CONVICTION HEARING

Petitioner testified at the post-conviction hearing that he did not commit the homicide, but rather was at a totally different location, Park Place Motors, at the time the homicide was committed, which was around 5:00 p.m. on October 22, 1996. He contended that Angelia Cowan, a person who was "like an aunt" to him, could verify his presence there because he called her from that location. He further testified that the owner of Park Place Motors, David Todd, could also verify his presence there. Petitioner testified he was purchasing a Mercedes at that time at Park Place Motors, paid $15,000 down in cash, and had the car titled in Cowan's name as he had done on three prior occasions at different dealerships when he purchased a Lexis and two Cadillacs. On cross-examination, petitioner conceded that he was aware that cash transactions over $10,000 were to be reported, and that Todd was titling the Mercedes in Cowan's name to conceal petitioner's $15,000 cash payment. He further testified that he informed his attorney of these two alibi witnesses, but counsel ineffectively chose not to present them at trial. Petitioner testified that trial counsel did not discuss trial strategy prior to his trial by jury and rarely met with the petitioner to discuss the case.

Angelia Cowan testified this was the fourth occasion in which she had assisted the petitioner in purchasing vehicles by allowing the vehicle to be titled in her name. She conceded the petitioner paid her for her accommodations, but she "[did not] have any idea what he paid [her]." Cowan testified that she spoke with both the petitioner and Todd on her celluar phone about 5:30 p.m. A copy of her cellular phone record, reflecting an incoming call at approximately 5:30 p.m., was introduced into evidence. She gave this phone record to trial counsel; however, trial counsel did not call her as a witness at trial.

-4-

Cowan denied that she knew she was participating in illegal transactions with regard to the car purchases. She further stated her conversation with the petitioner originated with her call to the dealership; "[i]t wasn't about the car;" and "[i]t just so happened that he was at the car dealership." Cowan testified that after this transaction, she began seeing Todd on a romantic basis.

Robert Todd testified that he met the petitioner for the first time when he came to the dealership on the date of the homicide. He stated the petitioner called him at approximately 4:45 p.m. on this date and appeared at the dealership at approximately 5:00 p.m. He testified that both he and the petitioner had multiple conversations with Cowan over a period of fifteen to thirty minutes concerning the car being titled in her name, and he secured detailed information from Cowan "line by line on the [credit] application." He stated the petitioner left the dealership at approximately 5:45 p.m. He provided this information to trial counsel's investigator but was not called as a witness at the trial.

Todd stated that he did not know the petitioner nor Cowan prior to that time. He conceded he paid $25,000 for petitioner's bond at Cowan's request at some time after petitioner's arrest. He further acknowledged a prior conviction for tax evasion.

Charles Scott, a private investigator retained by trial counsel, testified he conducted a thorough fact investigation. He was aware that both Cowan and Todd contended petitioner was at the dealership at the time the homicide was committed. He estimated that the dealership was approximately twelve to fifteen miles from the scene of the homicide.

Trial counsel was a veteran criminal defense attorney with extensive experience in murder trials, including capital cases. He testified that he had represented the petitioner in a number of prior cases and had a good relationship with the petitioner and his family.

Trial counsel testified that he conferred with the petitioner on numerous occasions and thoroughly discussed trial strategy. He was aware that Cowan and Todd were potential alibi witnesses but considered their testimony weak. He believed the best trial strategy was to concentrate on the weakness of the state's eyewitness identification rather than subject these two questionable alibi witnesses to cross-examination. More specifically, trial counsel believed the testimony of Cowan and Todd would convey to the jury that they and the petitioner were involved in a money laundering scheme, which would portray the petitioner as a gangster or drug dealer. Both were obviously interested witnesses, and counsel was further aware that, at some time prior to trial, Todd had been arrested by the federal authorities for money laundering. Counsel reviewed the telephone record and did not consider it conclusive. He discussed the two potential alibi witnesses with the petitioner and told petitioner he did not believe they should be called as witnesses. Petitioner trusted counsel's judgment on this issue.

## POST-CONVICTION COURT'S FINDINGS

Judge Cheryl Blackburn, the post-conviction judge, issued a detailed, fourteen-page order with extensive findings of fact and conclusions of law. The post-conviction court concluded, *inter alia*, that trial counsel's decision not to utilize the potential alibi witnesses was a reasonable tactical decision; petitioner did not establish a reasonable probability that their testimony would have made a difference at trial; trial counsel thoroughly conferred with petitioner regarding trial strategy; and trial counsel fully investigated the background of the victim and the eyewitness. In summary, the trial court concluded petitioner failed to show any deficiencies by trial counsel and further failed to establish prejudice as a result of trial counsel's representation.

## STANDARD OF REVIEW

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show (1) that counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. *See* Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Our supreme court has applied the Strickland standard to the right to counsel under Article I, Section 9 of the Tennessee Constitution. *See* State v. Melson, 772 S.W.2d 417, 419 n. 2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197 (D.C. Cir. 1973). In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; s*ee* Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Burns, 6 S.W.3d 453, 463 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068) (citations omitted).

The petitioner bears the burden of proving the factual allegations that would entitle petitioner to relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de*

*novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. Burns, 6 S.W.3d at 461. However, the post-conviction court's conclusions of law – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a *de novo* standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001) (citations omitted).


## ANALYSIS

Petitioner contends trial counsel was ineffective in the following particulars: (1) failing to present alibi testimony; (2) unilaterally determining not to present an alibi defense; (3) failing to adequately consult with the petitioner; and (4) failing to investigate the victim's and the eyewitness's background. We disagree with the petitioner in all respects.

### A. Alibi Defense

The record reflects that trial counsel thoroughly investigated the alibi defense, considered it a weak defense, and advised the petitioner against using the two witnesses. The credibility of both witnesses was highly suspect; it was apparent to counsel that both witnesses and the petitioner were involved in a money laundering operation. By utilizing these two witnesses, the jury would be aware of this and associate the petitioner with money laundering and, perhaps, drug dealing. By not using these two witnesses, the jury would be unaware of such prejudicial evidence.

The cellular phone record of Angelia Cowan is far from determinative. Firstly, we note the only phone record introduced at the hearing was that of Cowan's, who was not at the dealership. Neither the phone record from the dealership nor the cellular phone record of the petitioner, if indeed he had a cellular phone, was introduced. The phone record does not establish the names of the persons she called nor the names of the persons who called her, although the phone numbers are reflected on the phone record. There was no testimony as to petitioner's cellular phone number or whether he even had a cellular phone. There was no testimony as to the dealership's phone number.

Furthermore, Cowan only had one incoming call about 5:30 p.m., and the document does not establish who made this call. In fact, this line on the phone record was blackened out, making it illegible in some respects. There are outgoing calls from Cowan's phone at approximately 5:30 p.m. to at least two different numbers, again, the identity and location of the persons called being unknown.

If this incoming call was from the dealership, the phone number appears to be the same number from which Cowan received numerous calls earlier that day and at various hours on the two preceding days. This would be inconsistent with Todd's testimony that he did not know Cowan prior to this transaction. We also note Cowan's testimony that she initiated the call to the dealership for reasons unrelated to this transaction, and "[i]t just so happened that [petitioner] was at the car

dealership." Furthermore, of the four conversations reflected on Cowan's phone record between 5:27 p.m. and approximately 5:30 p.m., three different phone numbers were involved.

As to the possibility that the incoming call was from the petitioner's cellular phone, the record, as previously stated, does not establish whether or not he had a cellular phone or, if so, what his number was. Furthermore, although it is hard to decipher, the phone record of the incoming call appears to reflect a nine-minute conversation, and the other four outgoing calls from 5:27 p.m. to 5:39 p.m. were each one minute or less. This is inconsistent with Todd's testimony that the conversations lasted from fifteen to thirty minutes.

More importantly, the documentary evidence does not establish whether or not the petitioner was actually at the dealership if indeed he did talk with Cowan. The establishment of this fact would depend totally upon the credibility of Todd.

In short, trial counsel thoroughly investigated and considered the potential alibi defense. The alibi testimony was extremely suspect and would interject otherwise inadmissible, highly prejudicial evidence into the trial. We are certainly unable to find trial counsel's decision not to use such testimony deficient performance. In fact, had such evidence been introduced and petitioner convicted, a much more plausible argument could be made that such would constitute ineffective assistance of counsel. In addition, the post-conviction judge, after hearing the testimony of the two witnesses, concluded petitioner *failed* to establish "by clear and convincing evidence that, had trial counsel called Angelia Cowan and David Todd to testify on his behalf, there was a reasonable probability that the jury would have had a reasonable doubt regarding petitioner's guilt." The evidence does not preponderate against this credibility determination by the post-conviction court.

The petitioner contends trial counsel's decision not to present the alibi defense invaded the province of the jury. We must disagree. Certainly, questions of witness credibility in a trial are determined by the jury as the trier of fact. *See* State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). However, this is not to suggest that trial counsel should present any and all witnesses simply because they will testify in favor of a defendant. Trial counsel has an obligation to advise a defendant whether counsel believes a certain witness's testimony will be viewed as credible by a jury. Trial counsel did not invade the province of the jury by advising petitioner as to the disadvantages of calling the two potential alibi witnesses and failing to call them as witnesses.

In summary, the post-conviction court's finding that trial counsel's determination not to utilize the alibi defense was reasonable is clearly supported by the record. We may not second-guess this reasonable trial strategy; it was an informed one based upon adequate preparation and investigation. *See* Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Furthermore, we agree with the trial court's determination that petitioner has failed to establish a reasonable probability that the alibi defense would have affected the outcome of the trial. *See* Burns, 6 S.W.3d at 463.

### B. Unilateral Determination Not to Present Alibi Defense

Petitioner contends trial counsel was blatantly deficient in unilaterally deciding not to present an alibi defense without proper consultation with the petitioner. The post-conviction court accredited the testimony of trial counsel indicating he discussed the advantages and disadvantages of the alibi defense with the petitioner; this was not a unilateral determination. The evidence does not preponderate against the finding of the post-conviction court.

### C. Consultation with the Petitioner

Petitioner contends trial counsel failed to adequately consult with petitioner prior to trial. The trial court concluded otherwise; the record indicates trial counsel thoroughly discussed the case with petitioner on numerous occasions prior to trial. The evidence does not preponderate against this finding of the post-conviction court.

### D. Investigation of Other Issues

Finally, petitioner contends trial counsel failed to investigate the background of the victim, which might establish "theories for whom might have had a motive to kill [the victim]," or the eyewitness's background. The testimony indicated that trial counsel and/or his investigator thoroughly investigated all aspects of this case. The record specifically reveals trial counsel's investigator indeed investigated the background of the victim as well as the background of the eyewitness. His investigation did not reveal anything that would be beneficial at trial. The evidence does not preponderate against the trial court's finding that the investigation of these two persons was not deficient. Furthermore, petitioner presented no evidence at the hearing concerning the victim's or the eyewitness's background that would have an effect on the outcome of the trial.

### CONCLUSION

We agree with the post-conviction court's determination that petitioner has failed to establish ineffective assistance of counsel. Specifically, he has failed to establish that trial counsel's performance was deficient and has further failed to establish a reasonable probability that the result of the trial was unreliable because of the actions of trial counsel. Accordingly, we affirm the judgment of the post-conviction court.

_____
JOE G. RILEY, JUDGE