IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 6, 2018

## STATE OF TENNESSEE v. SIRANTHONY WILLIAMS

**Appeal from the Criminal Court for Shelby County**
No. 17-00620        John W. Campbell, Judge

_____

### No. W2018-00413-CCA-R3-CD

_____

A Shelby County Criminal Court Jury convicted the Appellant, Siranthony Williams, of aggravated robbery, and the trial court imposed a sentence of ten years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, specifically his identity as the perpetrator of the offense. Upon review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark Bowman, Memphis, Tennessee, for the Appellant, Siranthony Williams.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Amy P. Weirich, District Attorney General; and Nicole Germain and Danielle McCollum, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Shelby County Grand Jury charged the Appellant and his co-defendant, Jamar Reed, with the aggravated robbery of Lekesia Sellers ("the victim") outside a Best Way Rent to Own furniture store ("Best Way") on October 7, 2016.

At the Appellant's trial, Reed testified that he was the Appellant's cousin and the fiancé of Centerial Johnson, who was the credit manager at Best Way at the time of the offense. On nights when Johnson had to make bank deposits after closing the store, she sometimes asked Reed to follow her to ensure her safety.

Reed said that he met the victim, who was a manager at Best Way, when he visited Johnson at the store. On one occasion, Reed and the Appellant took lunch to Johnson while she was working. The men drove either Reed's white Chrysler 300 or the Appellant's red Chevrolet Impala to the store. On a second occasion, Reed and the Appellant drove the Appellant's Impala, and they went inside the store to give Johnson her lunch. While there, the Appellant spoke with the victim. Reed thought the Appellant was "interested" in the victim, but the victim told the Appellant that she had a boyfriend. Later that day, Reed and the Appellant returned to the store to take Johnson home from work.

On the evening of October 7, 2016, the Appellant called Reed and said he was on his way to Reed's house. When he arrived, the Appellant said, "I need you to take a ride with me. I'm fixing to confront [the victim] in front of her dude." Reed understood the Appellant to mean that he wanted to ask the victim about her relationship with her boyfriend. The Appellant did not state explicitly where they were going, but Reed knew the victim was at work.

The Appellant and Reed left the house at approximately 5:00 p.m. in the Appellant's red Impala. The Appellant drove to Frayser Boulevard, a street near Best Way. The Appellant parked in the driveway of a house that appeared to be vacant. The men got out of the car and walked to Best Way's parking lot. The store was still open. Reed assumed the Appellant avoided parking in front of the store because he did not want the victim to see his car. While they waited in the parking lot, they talked about "the Cowboy[s'] games." Reed assumed the Appellant was waiting for the victim to leave the store.

Reed "guess[ed]" that the Appellant "saw something inside the store or something went on," and the Appellant pulled out a gun. When Reed saw the gun, he "struck out running back toward the car." Reed explained that he did not know the Appellant had a gun and surmised that the gun may have been tied to a drawstring inside the Appellant's shorts. Reed explained that the Appellant was wearing baggy basketball shorts, which usually did not have pockets. Earlier, the Appellant had given him the car keys. Reed explained that he ran because he was afraid for his life and that being the Appellant's cousin "don't mean nothing. I see folks getting killed by family members all the time on the news. I don't want to be one of the ones being left out here."

Reed said that he ran back to the vacant house and got into the car. As he was driving away, he saw the Appellant "c[o]me from behind a house." He stopped and let the Appellant get into the car. Reed decided to stop because he was afraid of the Appellant, was unfamiliar with Frayser, and had to use GPS to get around while he was in Memphis. The State showed Reed a video, and he acknowledged the video showed

- 2 -

the Appellant parking the car in front of the vacant house and walking toward Best Way. Later, the video showed Reed running back to the car.

Reed said that he and the Appellant did not talk during the drive to Reed's house. He explained, "We ain't got nothing to say after this. This is just you go on your way, I'm going on mine." When they got to Reed's house, the Appellant went inside the house, retrieved his toiletry bag, and left the house. Reed told Johnson that she "wouldn't believe what [the Appellant] just got me into" and described what the Appellant had done.

Reed heard nothing further about the incident until he saw a report about the robbery on the television news approximately one and one-half to two weeks later. Reed said that he was "horrified" by the news report. Reed was afraid to tell the police about the incident because the Appellant knew where he lived, and he thought that if the Appellant "hit [the victim] in the face with a gun, just imagine what he might do to me." Reed called the Appellant and asked about the robbery. The Appellant maintained that he did not rob Best Way, that he would not rob anyone, and that he "wouldn't do nothing like that with [Reed]." Reed began thinking that the news story had been fabricated and that the Appellant might have run away after getting into a fight at the store.

Reed said that sometime after the news report aired, a detective called and asked if he knew the Appellant. Reed responded affirmatively. The detective said that the victim had been robbed and told Reed the day the robbery occurred. The detective then asked if Reed thought the Appellant could have committed the robbery. Reed replied that he had asked the Appellant and that the Appellant denied committing the robbery. The detective asked Reed to come to the police station to give a report. After missing several meetings with the detective, Reed turned himself in to the police.

Reed agreed that he had not been offered anything in exchange for his testimony. He said that he wanted to testify because "the truth got to be told about me. [The Appellant] ain't going to tell the truth." Reed maintained that the Appellant and the Appellant's mother had tried to convince Reed to "take the charge" for the Appellant. The Appellant offered to take care of Reed's family if he would accept responsibility for the crime. Reed declined, saying that all he did was drive away from the scene.

The victim testified that she met Johnson at a prior job and that she met Reed through Johnson. After Johnson began working at Best Way, she told the victim that a sales manager position was available, and the victim was hired for the position in September 2016.

The victim said that she and Johnson were responsible for counting the money at night and taking the money to the night deposit at Region's Bank at Frayser Boulevard

and Range Line, which was about a five-minute drive from the store. The victim said sometimes she took the night deposit and sometimes Johnson took it. Occasionally, Johnson or the victim's boyfriend, Kennedy Qualls, followed the victim when she made the deposits. The victim said the amount of the deposits varied, but it was usually around $1,200.

The victim recalled that Reed occasionally drove Johnson to work. The victim met the Appellant on one of those occasions. She knew the Appellant only as "Anthony." The Appellant's conversations with the victim were friendly but not flirty. He did not ask her on a date but did ask if she was in a relationship. The victim told the Appellant that Qualls, whom the Appellant knew, was her boyfriend.

On October 7, 2016, the victim was working at Best Way. The store closed at 7:00 p.m., and around 7:55 or 8:00 p.m., the victim and her co-workers, Antonio Morgan and Jonathan Strickland, left the store. The victim was the first person to walk out the door. Her purse was on one arm, and the deposit bag containing approximately $978 was on her other arm. Qualls was there to pick up the victim, and she walked to the front passenger side of Qualls' car. Although it was dark outside, she saw a man walk toward her from the back of Qualls' car. The man did not say anything but began "grabbing" and "scuffling" with the victim. She was not certain whether the man was trying to take her purse or the deposit bag. As they were "going back and forth with each other," a light hit the man's face, and the victim recognized the Appellant. The victim said that she almost called out the Appellant's name, but he pressed a gun against her neck. She thought the Appellant was going to kill her. They continued to wrestle until the Appellant hit her head with the handle of the gun. The victim dropped the deposit bag and her telephone. The Appellant picked up the bag and ran toward the trees.

The victim said that blood was "gushing" from the wound on her head. Qualls and her co-workers came to help her. Someone called for assistance, and the police and an ambulance came to the scene. The victim was taken to Baptist Memorial East Hospital, where she had three stitches to close the "open gash" in her head. The victim said that after the Appellant ran away, she was hysterical, scared, and hurt. She also was mad because she liked the job but felt compelled to quit because she no longer felt safe.

After the robbery, the victim called Johnson and told Johnson who the perpetrator was. The victim said that she was surprised because she did not think "anyone could do that." The victim said that she did not see Reed on the night of the robbery.

Sometime after the robbery, detectives showed the victim a photograph of a car, and she identified it as the Appellant's red Chevrolet Impala. On October 17, 2016, the police showed her a photograph array, and she identified the Appellant as the perpetrator.

- 4 -

On cross-examination, the victim said that she had met the Appellant a few times before the robbery. She said that she did not know him well, but she knew him well enough to recognize him. She could not recall if she told the police immediately after the offense that the Appellant was the perpetrator.

Kennedy Qualls, the victim's fiancé, testified that he occasionally picked up the victim at Best Way. On October 7, 2016, Qualls arrived at the store around 7:00 p.m. and waited in his car for the victim to get off work at 8:00 p.m. Qualls was listening to music and looking at his cellular telephone when the victim came out of the store. He briefly looked up from the telephone, saw the victim walking toward his car, and then looked back down at the telephone. At that time, nothing unusual was happening. Qualls then felt his car shake, and he looked up and saw a man "tussling" with the victim. Qualls got out of the car and ran toward the victim. He saw that the man had hit the victim in the head with a gun and that the victim had dropped the deposit bag. As Qualls approached, the man pointed the gun at Qualls, causing Qualls to "st[an]d back." The man ran from the parking lot toward the street behind Qualls' car. Qualls had never seen the man before that night. Qualls said he never got a good look at the man, explaining, "I just know he was tall. I just couldn't really remember his face."

Qualls approached the victim to help and saw that her face was covered with blood. The victim appeared shocked and was crying, but she managed to call the police. An ambulance also came to the scene, and medical personnel helped clean the victim's head wound. Afterward, Qualls drove the victim to the hospital, and she had stitches to close her head wound. After the robbery, the victim was scared to return to work. She cried for two or three days and eventually quit her job.

Antonio Morgan testified that on the evening of October 7, 2016, he, the victim, and Strickland were the only employees working at Best Way. They closed the store around 6:15 or 6:20 p.m. and walked out together. It was dark outside. The victim walked out the door first, and the men were right behind her so they could lock the door. As they walked toward their respective vehicles, a man came around the corner of the store and approached the passenger side of Qualls' vehicle. The man hit the victim on the top of her head with the gun, "got the purse, got the [deposit] money," then ran around the corner of the store. Morgan did not recognize the man and did not hear the man say anything.

After the perpetrator left, Morgan approached the victim and asked if she was okay. She complained about her head hurting. Someone called for assistance, and the police and an ambulance arrived. The victim was bleeding, she had a couple of bruises, and she had to get some stitches. Morgan told the police everything he had seen.

Jonathan Strickland testified that on October 7, 2016, he, the victim, and Morgan worked at Best Way until closing time. They walked out of the store together, with the victim preceding the men by a couple of seconds. As Strickland was locking the door, he heard the victim scream. He turned around and saw a man run through the parking lot toward the side of the store. Strickland did not recognize the man and did not see him do anything.

Strickland looked at the victim and noticed she was bleeding from a "big gash" on her forehead. Upon hearing the victim say that the man had a gun, Strickland decided not to chase the man. Because of the amount of blood coming from the victim's wound, Strickland thought she might have been shot.

Sometime after the robbery, the police came to the store to talk with Strickland. The police showed him a photograph of a car that had been parked around the block from the store. Strickland recognized the vehicle as the red Impala that was driven by a friend of Johnson who occasionally came to the store. Strickland had seen the car on one or two occasions, and he first noticed the car a week or two prior to the robbery.

Centerial Johnson testified that she and the victim became friends when they worked together at a previous job. In June 2016, Johnson began working at Best Way as a credit manager, and sometime thereafter, the victim began working at the store as a sales manager. As managers, they were responsible for making nightly cash deposits at a bank which was located approximately "10 minutes down the street." The amount of the deposits varied each night. The maximum she had deposited on one night was $4,000. Johnson explained that she made the deposits on the nights she worked; otherwise, the victim made the deposits.

Johnson stated that if she had to deposit a large amount, she called Reed to follow her to the bank. Additionally, Reed sometimes drove her to and from work and to the bank when she had problems with her car. On two occasions, the Appellant came to the store with Reed, and he met the victim. The men usually drove the Appellant's red Chevrolet Impala. Johnson said that the Appellant never accompanied her and Reed to the bank to make a deposit.

Johnson said that on the day of the offense, she did not work and was on bed rest due to a medical problem. That night, a sales representative called to report that the store alarm was going off and that the victim had been robbed. When Johnson asked for additional information, the sales representative handed the telephone to the victim. The victim was crying and could not talk.

The victim called Johnson later that night and said she had been robbed. Johnson told the victim that a couple of days before the offense, the Appellant was at Johnson's

home and "asked [her] about doing a snatch and run at [her] job," which meant to "[t]ake the money and leave." Johnson rejected the Appellant's suggestion because she needed to keep her job.

Johnson said that after she recalled her conversation with the Appellant, she was scared because the Appellant knew where she lived, she had small children, and she did not know if the Appellant would retaliate if she said anything to the police. Nevertheless, when the police questioned Johnson after she returned to work, she told them everything she knew. She did not tell the police the Appellant's last name because she did not know it.

Johnson stated that Reed lived with her and that on the day of the offense he was at home all day. Sometime that night, Reed left the house. Johnson did not know if Reed left with the Appellant; however, the Appellant was with Reed when Reed returned around 8:45 p.m. Johnson was lying on the couch playing with her baby and talking on the telephone with the victim when the men walked into the house.

On October 17, 2016, Johnson was shown a photograph lineup by the police, and she identified the Appellant as the person who had asked about "doing a snatch and run at [her] job."

On cross-examination, Johnson acknowledged that she had no firsthand knowledge of the crime.

Memphis Police Officer John Mosley testified that during the night of October 7, 2016, he was dispatched to Best Way on Frayser Boulevard. When he arrived, he spoke with the victim, who was bleeding from a laceration on her forehead. The victim gave Officer Mosley a description of the suspect, which he broadcast over the police radio. Officer Mosley wrote a report detailing the victim's statement regarding the robbery. He gave the statement to the investigators and had no further involvement with the case.

On cross-examination, Officer Mosley acknowledged that the victim did not identify the perpetrator by name.

Detective Brian Vincent began investigating the case the day after the crime. He spoke with the victim either that day or the next day. He reviewed the crime report, which reflected that the robbery occurred around 8:10 p.m. and that the suspect ran from the scene and into the woods in the direction of Riney Street. Detective Vincent went to the store and canvassed the area for potential surveillance videos but found none. However, he recalled seeing a video in another case that had been taken from a residence on Riney Street, which was located just east of the store. Detective Vincent watched the video, which was in black-and-white. The video showed that around 7:00 p.m., a light-

colored four-door sedan backed into the driveway of a vacant house and parked with the front of the car facing the street. Two males exited the car and walked east across the street and along the sidewalk, ultimately leaving the camera's view. At approximately 8:10 p.m., a man ran from the direction of the store, got into the driver's side of the car, and drove north on Riney Street until the road made a westbound turn, leaving the camera's view.

Detective Vincent took a photograph of the car, returned to Best Way, and asked the employees if they recognized the car. An employee said the car belonged to a friend of Johnson's boyfriend. Johnson was not working that day, but Detective Vincent spoke with her a few days later. Johnson recognized the car in the photograph and said that it belonged to "Anthony." Johnson did not know Anthony's full name.

Detective Vincent said that on Facebook, a fellow officer found a photograph of someone he believed might be Anthony. Detective Vincent showed the photograph to Johnson, who confirmed the person was Anthony. The police put out an internal "Be On the Lookout" notification ("BOLO") as well as a public media release in order to determine Anthony's full name. From a tip, the police obtained the Appellant's full name and contact information. A photograph lineup that included the Appellant's photograph was compiled, and the police showed the lineup to Johnson and the victim. The women identified the Appellant from the lineup.

After the State rested its case-in-chief, the Appellant called his mother, Ladonna Jefferson, as an alibi witness. Jefferson testified that on July 30, 2016, her oldest son was hospitalized as the result of a violent crime, and he spent a total of eight months in the hospital. Although the Appellant did not live with her during that time, he spent most nights at her residence, his sister's residence, or the hospital.

Jefferson recalled that on the evening of October 7, 2016, the Appellant was at her house in West Memphis, Arkansas. Around 6:15 or 6:30 p.m., she drove the Appellant's red Impala to Walmart while he stayed at the house to watch his younger siblings. Jefferson went to the Walmart store on East Service Road in West Memphis. Her grandchildren were having a birthday party the next day, and she shopped for food, decorations, and gifts. When she returned home at 11:47 p.m., the Appellant was asleep on the couch.

On cross-examination, Jefferson stated that she was in Walmart for over five hours and spent over $500. She denied that she asked her nephew, Reed, to exonerate the Appellant and accept responsibility for the robbery.

Based upon the foregoing proof, the jury found the Appellant guilty of aggravated robbery. The trial court sentenced the Appellant as a Range I, standard offender to ten years in the Tennessee Department of Correction.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, specifically his identity as the perpetrator of the offense.

## II. Analysis

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

The Appellant does not deny that a robbery occurred at Best Way on the night of October 7, 2016; however, he contends that the State failed to prove his identity as the perpetrator. In support of this contention, the Appellant notes his mother's testimony that he was at her house at the time of the robbery. The Appellant maintains that the testimony of the victim, who was the sole eyewitness who identified him as the perpetrator, was questionable. He notes that it was dark at the time of the offense and that she failed to identify him by name immediately after the offense. He emphasizes that his co-defendant Reed did not see the actual robbery and that the other witnesses had no firsthand knowledge of the robbery or were unable to identify the perpetrator.

This court has explained a perpetrator's identity "is an essential element of any crime" that the State must prove beyond a reasonable doubt. State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. at Nashville, Apr. 19, 2005). A perpetrator's identity "may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Juan Diego Vargas, No. M2015-02458-CCA-R3-CD, 2017 WL 678839, at *5 (Tenn. Crim. App. at Nashville, Feb. 21, 2017), perm. to appeal denied, (Tenn. June 7, 2017). Generally, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

In the light most favorable to the State, the proof adduced at trial revealed that the Appellant and Reed were cousins. The Appellant occasionally went with Reed to pick up Reed's girlfriend, Johnson, from her job at Best Way. The Appellant knew that Johnson and the victim were responsible for taking the store's nightly deposits to the bank. A couple of days prior to the robbery, the Appellant approached Johnson about doing a "snatch and run," which Johnson declined. On the night of the offense, the Appellant asked Reed to go with him to the store, purportedly so the Appellant could "confront" the victim, in whom he had expressed an interest. The men parked the Appellant's red Impala at a vacant house near the store, walked to the store, and waited in the parking lot until closing. Reed ran from the parking lot when he saw the Appellant pull out a gun. When the victim and her co-workers walked out of the store, the Appellant approached the victim as she was walking towards her boyfriend's car, pointed a gun at her, and struck her on her head with the gun. He took the deposit bag containing approximately $978. The victim suffered a gash on her head and had to have three stitches to close it. Video from a nearby house showed the Appellant's car pull into the driveway of the vacant house and park facing the street. The video, which showed the two men walking in the direction of the store, was consistent with Reed's testimony about his and the

Appellant's actions immediately prior to and after the robbery. Although Qualls, Morgan, and Strickland were not able to identify the perpetrator, the victim positively identified the Appellant as the perpetrator.

The Appellant contends that "the weight of [the] evidence presented at trial is insufficient to find him guilty of aggravated robbery." However, it is well-established that "[i]n determining the sufficiency of the evidence, [an appellate court] should not reweigh or reevaluate the evidence." State v. Robinson, 400 S.W.3d 529, 533 (Tenn. 2013) (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). We conclude that the proof adduced by the State was sufficient to sustain the Appellant's conviction of aggravated robbery of the victim.

### III. Conclusion

We affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE