IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2017

## STATE OF TENNESSEE v. ADAM DAVIS

**Appeal from the Circuit Court for Montgomery County**
**No. 2015-CR-611   William R. Goodman, III, Judge**

_____

### No. M2017-00293-CCA-R3-CD

_____

Following a bench trial, the Defendant-Appellant, Adam Davis, was convicted of two counts of aggravated sexual battery, a Class B felony. See T.C.A. § 39-13-504. The trial court sentenced him as a Range I, standard offender to a concurrent term of eight years' imprisonment. The sole issue presented for our review is whether the evidence is sufficient to support his convictions. After a thorough review of the record and briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Roger E. Nell, District Public Defender, Clarksville, Tennessee (on appeal) and Crystal L. Myers, Assistant Public Defender, Clarksville, Tennessee (at trial), for the appellant, Adam Davis.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; John W. Carney, District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was indicted on several counts of aggravated sexual battery and rape of a child for forcing the victim, A.T., his girlfriend's six-year-old daughter, to engage in various sexual acts including oral-oral contact, penile-oral contact, and penile-digital contact from April to December 2014.[1] At trial, the victim's mother testified that she met the Defendant in high school and lived with him from October 2011 to January

---

[1] It is the policy of this court to refer to minor victims and their family members by their initials.

2015.  In April 2014, they lived together in a home on Oak Park Court in Clarksville, Tennessee.  The victim and her brother had their own rooms, and the Defendant and the victim's mother shared a room.  The victim's mother observed the Defendant's behavior around the victim and described it as normal.  During the offense timeframe, the victim's mother worked long hours, and the Defendant watched the children for her.  The victim's mother recalled that sometimes the victim would cry when she left for work.

The victim's mother explained that the children acknowledged privacy in their home, went into their own rooms to change clothes, and closed the doors when changing or showering.  The children never observed her and the Defendant engaged in sexual activity.  Although she had not yet had the "birds and bees" conversation with the victim, the topic of appropriate and inappropriate touching was discussed in school.  The victim's mother reviewed the materials sent home by the school and ensured the victim understood them.

After the victim told her mother about the Defendant's sexual abuse, the victim's mother called and confronted the Defendant, who denied everything.  The victim's mother testified that she did not return home that day.  However, because of their financial connection, she maintained a brief relationship with the Defendant.  The Defendant gave the victim's mother rides to and from work during which he tried to convince her of his innocence.  Finally, the victim's mother confirmed that she never told the victim what to say during this process.

On cross-examination, the victim's mother said the victim was not having trouble in school in April 2014.  She also confirmed that prior to April 2014, they lived with the Defendant's mother and shared one room with the children.  Although the Defendant had back surgery in May 2014, he was able to take care of the children.  However, the victim's mother bathed the children exclusively, except on one or two occasions.  When she confronted the Defendant with the victim's allegations, he provided the following explanations:  (1) "[the victim] probably overheard some noises from our bedroom and then had a bad dream"; (2) "[the victim's mother] shouldn't throw away [their] relationship when it's going to come out in a few days that [the victim] lied and then [they] won't be able to reverse the damage from this"; (3) "[the victim's] been very upset when [the victim's mother has] to work nights and it was only a matter of time before [the victim] came up with something to say and try to get [the victim's mother] to stay home"; and (4) "[h]ow silly this all was and how [the victim's mother knew] what kind of person he is.  [She knew] he could never do anything like that."

The victim's mother also confirmed that she sent the following text message to the Defendant's mother:

Yes, ma'am, I understand. I told [the Defendant] I don't feel 100 percent that he did it, but . . . thoughts kept crossing my mind and I can't turn it off, no matter what he says. And we can't keep a relationship going like that.

I will still call the De[t]ective on Monday, and let him know I'm questioning her version of everything also. I don't want this to end badly for him no matter what happens.

The Defendant later helped the victim's mother purchase a car, which she felt "he owed [them], after everything that [they] had gone through." Even though the victim's mother briefly continued her relationship with the Defendant, she believed her daughter.

The minor victim was nine years old at the time of trial and six to seven years old at the time of the offenses. Without objection, she testified at trial and promised to tell the truth during her testimony. With the aid of a girl diagram, the victim identified the body parts that no one is supposed to touch. She then marked an X on the lips, belly, genitalia, and buttocks to illustrate where the Defendant inappropriately touched her. On a boy diagram, she marked an X on the lips, belly, genitalia, and buttocks to illustrate the body parts with which the Defendant inappropriately touched her. These diagrams were admitted into evidence as exhibits 1 and 2, respectively.

The victim told her mother what the Defendant did to her because she "did not want to do that anymore." She testified that she spoke with "a lady" about the abuse, identified a digital versatile disk (DVD) of her interview, and confirmed that everything she said in the DVD was true. The DVD of the forensic interview was then admitted into evidence, without objection, as exhibit 3, and played for the court. The DVD showed that on January 20, 2015, the victim was interviewed at Our Kids concerning allegations of child sexual abuse.[2] The DVD began with the interviewer asking the victim some preliminary questions including: "What were her favorite board games?"; "Who were her brother and sister?"; and "What she did the previous weekend?".[3] The interviewer then asked to talk with the victim about "why [she] had to come here?". In response, the victim told the interviewer that the Defendant was "doing bad things" to her, "like the private area thing" with her. The victim complied with the Defendant because she was "supposed to listen to parents," and she "did not know he was doing a bad thing."

---

[2] Our Kids is a medical evaluation and crisis counseling center that specializes in services for children when there are allegations or concerns of child sexual abuse.

[3] The forensic interview was not transcribed; therefore, these statements may not be verbatim.

The victim said that the Defendant told her to "keep it a secret," and she "accidentally promised him." Asked what the Defendant did to her, the victim said "the private area thing with me, touching it." Asked what the Defendant touched, the victim patted her lap near her genitalia with her hands and said that he touched "the whole private area." The victim initially stated that she never saw the Defendant's genitalia but then remembered that she did see it "accidentally." She said, "I know it's gross [and] disgusting. [H]e literally put it in my mouth." The victim confirmed that the abuse occurred in the house on her mother's bed or on the couch when her mother was not there and her brother was asleep. The abuse "only happened at nap time," never at night or in the morning, and occurred "last year when it was still hot." The victim explained that the Defendant would ask her if she wanted to go to sleep with him or in her own bed during naptime. Because she "did not really want to go to sleep," sometimes she "accidentally said 'sleep with him[.]'" "[T]he first time [the victim] said 'sleep with him' . . . [she] did not know he was gonna do that." She explained that when they were on the couch, the Defendant would put her in his lap, her legs would be "around him or on him," and the Defendant would "shake" her, "like rocking" her with their clothes on. The Defendant also "wanted [her] to kiss him on the mouth [and cheeks,]" which the victim described as "gross[.]"

The interviewer asked the victim to describe a time the Defendant did something to her from beginning to end. In response, the victim initially said, "[the Defendant] did something to me?" The interviewer referred the victim back to her previous comments, and the victim then replied that the Defendant was "putting [his genitalia] in [her] mouth and rubbing and patting" and that the Defendant made her "kiss him on the cheek or lips." The victim confirmed that the Defendant put his genitalia in her mouth more than once, explained that he made her "suck[] on it," and described it as "gross," "weird," and "wet."

Asked what was the first thing that would happen in bed, the victim said, "patting and also he made me touch it with my hand." When the Defendant made the victim touch "his private one," he made her "go up and down with it," which the victim demonstrated during the interview. She described his "private one" as feeling "really gross" like "dead skin or leaves." Asked what happened the most, the victim stated "the rubbing and patting and the up and down thing." She explained that the "rubbing" happened when the Defendant would rub his "private one" on her "private one" and she said that it felt "bad [and] gross. Everything was gross." The victim could not remember whether the patting occurred on the inside or outside of her genitalia, but thought it was on the outside. She said the "up and down thing" was on the outside of the Defendant's genitalia, which she again demonstrated with hand motions during the interview. Asked what would make it stop, the victim said that a "waterfall would come out" of the

Defendant's genitalia and that the "water" would either go on his "private one" or on her hand when she was touching him.

After the abuse, the Defendant would make the victim "wash down . . . with a washcloth and made [her] wash [her] private areas." The interviewer then pulled out a diagram of a girl and a boy, and the victim accurately identified which diagram showed the girl and which showed the boy. On the girl diagram, as the interviewer pointed to each body part, the victim identified the "eye, mouth, [nipples], belly button, private area, knee, hair, back, . . . bottom, [and] hand." On the boy diagram, as the interviewer pointed to each body part, the victim identified the "nose, belly button, . . . private area, . . . back, bottom, [and] foot." When the interviewer pointed to the boy diagram's belly button, the victim recalled that "[the Defendant] would lift up his [and her] shirt[s] . . . for [her] belly to be on his belly." She stated that the Defendant also made her take off her "underwear and pants." With a marker, the victim then made marks on the girl's body parts where the Defendant made her "wash up" her bottom and genitalia. Asked if something happened to her bottom and why she had to wash up there, the victim responded that "nothing happened," and that she was not sure why the Defendant "made [her] wash up" there. She stated that "his private area" touched her bottom more than once and identified those parts on the boy diagram. She explained that when the Defendant's genitalia touched her bottom, it was "usually . . . patting or rubbing."

Asked what the Defendant's genitalia looked like, the victim pointed to the boy diagram and said "that." She stated that it was "bigger because he's a grown up" and described the color as "not white, [more] tan." The victim said that no one else other than her doctor had ever touched her genitalia and that the abuse only happened at the Oak Park Court house. She said she was "probably never gonna see [the Defendant] again" and was "ok [because] it was bad that he did that, but we're safe now."

At some point while the DVD was playing, the victim, who was underneath a table with the court facility dog, began kicking and crying. In response, the court deputies gave her candy and hugged her. Defense counsel objected to this behavior as "coercive," and the court stopped the DVD. The State argued that it was not coercive because, at the time of the behavior, the victim was not testifying and only the DVD was playing. In addition, the State said that the court had the ability to "set aside tears and kicking" better than a jury, alleviating the need for a mistrial. The trial court expressed the need to remain impartial and stated that it "probably [wa]s not appropriate for court personnel to be giving out candy to witnesses." However, the court determined the actions were not "coercive, because of the nature of the testimony. It doesn't affect what's on the DVD of the forensic interview . . . which was properly authenticated." The remainder of the video was then played for the court.

- 5 -

On cross-examination, the victim testified that she was in first and second grade from April to December 2014. She could not remember her teachers' names but was able to remember her best friend's name. The victim shared a room with her mother, her brother, and the Defendant at the Defendant's mother's house and had her own room at the Oak Park Court house. At the Oak Park Court house, the Defendant was there most of the time, and the victim's mother was usually at work. During the forensic interview, the victim was unsure if the incidents with the Defendant happened at the Defendant's mother's house; however, she confirmed at trial that they only happened at the Oak Park Court house. She explained that it usually happened in the middle of the day while her brother was taking a nap. The victim denied creating bedtime stories at home and that anyone talked to her about inappropriate touching. Although she did not remember in which month the first incident happened, she was out of school at the time. The victim recalled the last incident occurred the week before she told her mother about the abuse.

Lisa Baeza, a social worker at Our Kids, testified regarding her interview of the victim, and her report was admitted into evidence as exhibit 4. Baeza spoke with the victim by herself and with her mother. The victim was seven years old at the time of the interview, was dressed appropriately, and had no problems building a rapport with Baeza. During the interview, the victim identified the part of her body that she urinates from as her "private area," and the part she defecates from as her "bottom." The victim told Baeza "that the parts on her body that people should not touch are her private areas and her mouth." Asked whether anyone had ever touched those areas, the victim stated that the Defendant had. The victim told Baeza that the Defendant touched her genitalia with "his private area" and identified it on the diagram as the body part from which he urinates. The victim explained "that her clothes were off when [the Defendant] touched her" and could not remember whether the Defendant touched her on the "inside" or "outside" of her genitalia. The victim said that this kind of contact happened more than once and that "sometimes . . . it would hurt and at other times, it didn't." Additionally, on more than one occasion, the Defendant's genitalia touched the victim's hand, the Defendant's genitalia went into her mouth, and the Defendant kissed the victim on her lips and cheeks. The victim denied that anyone else had ever touched her genitalia. On cross-examination, Baeza confirmed that she provided the child's presenting history and medical history to the medical provider, Heidi Dennis, who then performed the actual exam.

Heidi Dennis, a pediatric nurse practitioner at Our Kids, was tendered as an expert in the field of pediatric forensic examinations. She was advised that the victim's medical history consisted of oral-oral contact, penile-oral contact, penile-genital contact, and penile-digital contact. Although her exam of the victim revealed "no findings," Dennis explained that there generally are no physical findings with this type of contact. However, she agreed that "no findings" could also mean that no abuse occurred.

At the close of the State's proof, the State recited its election of offenses for the aggravated sexual battery as follows: the victim's description of "her hand going up and down on [the Defendant's] private" (count 2); the "rubbing and patting . . . on [the victim's] private one with [the Defendant's] private[,]" and the victim's description that the Defendant lifted their shirts so their bellies were touching, that her pants and underwear were removed, and that the Defendant "was patting [his private] on the outside [of her] private" (count 4); the Defendant's "rubbing and patting on her bottom with his private" (count 5); the abuse on the couch when the Defendant "rock[ed] her back-and-forth with her legs straddled around him" while the victim was facing forward watching TV and while she was facing Defendant with their shirts up and bellies touching (counts 6 and 7).

**Defense Proof.** Sharon Connor, the Defendant's mother, testified that she had a "wonderful relationship" with the victim and her mother during the time that they lived with her. She spent quality time with the victim and remembered that she made up stories when they played with Barbie dolls together. When the Defendant had back surgery in May 2014, she helped with the children while the victim's mother was at work. She never observed the victim acting strangely towards the Defendant. She recalled the Defendant and the victim bathing together on several occasions when they lived with her. Regardless, she said the Defendant was always "professional" around the victim, never allowed her to sit in his lap, and was never alone with either child.

Connor texted the victim's mother after the reported abuse and recalled the victim's mother did not completely believe the victim. Connor denied harassing the victim's mother or coercing her to send the responding text message. The Defendant's mother confirmed that the Defendant and the victim's mother continued their relationship "at least . . . three months" until the victim's mother and her children moved to Ohio. After they moved, Connor stated she kept in touch with them, including "Skyping with [the victim while her mother] would sit there with her." She stated that the victim wanted to talk to the Defendant, but "knew that she couldn't." Connor said the Defendant never left the State after the reported abuse, even though the detectives confirmed he could still travel.

The Defendant's mother recalled overhearing conversations between the Defendant, the victim's mother, and the victim regarding appropriate and inappropriate touching. Specifically, she remembered them telling the victim that if she were ever touched inappropriately, she needed to tell someone—her mother, the Defendant, a teacher, or a policeman. Connor said that no one had ever made allegations like this against the Defendant before, that she would not support the Defendant if she believed he had done this, and that she would have helped him get help if she knew this was going

on. She stated these allegations greatly affected the Defendant's life, causing him to lose weight, become depressed, and file for bankruptcy.

On cross-examination, the Defendant's mother confirmed that she had been in the victim's life for approximately three years and that they had a "wonderful relationship[.]" She emphasized that the Defendant was very professional with the victim, never allowed her to sit in his lap, and was never alone with the children. Although she knew most of what happened at her house, she could not be sure of what happened between the Defendant and the children at the Oak Park Court house.

Amanda Davis, the Defendant's estranged wife, stated that she had known the Defendant since they were five years old and that no one had ever made child sexual abuse allegations against him. While stationed in Japan when the Defendant was in the military, she cared for many children as a babysitter. The Defendant was often around those children and no allegations of abuse were ever made against him. She said that if she believed the Defendant had any tendencies to harm children, she would not allow the Defendant to have visitation with their son. She stated that their son had visitation with the Defendant and that she did not believe the Defendant was capable of child sexual abuse. On cross-examination, she reiterated that while they were in Japan, she observed the Defendant having very normal, playful interactions with children. She stated that the Defendant was professional and appropriate with the children at all times and always acted "as an adult should act."

While growing up with the Defendant, his sister, Nikki Davis, often had their friends and cousins come over to the house. Some of the girls stayed at the house overnight, and there were never any allegations of the Defendant inappropriately touching anyone. Davis testified that the Defendant was very protective of her and the women in their family. She has two young boys, and the Defendant was one of the only people she allowed to watch them. She stated that she would not testify on his behalf if she believed the Defendant did this.

The Defendant testified that he never inappropriately touched the victim, never rubbed or patted her genitalia, and never put his genitalia in her mouth. He stated that he was honorably discharged from the Air Force in May 2008 due to his back injury. He did contract work from 2010 until he could no longer get a job because of required background checks which included the reported child sexual abuse. The Defendant described his life with the victim's mother and her two children as "almost perfect," but stated that his life has now been "devastated" and that he does not know why the victim would "make this up." Regarding their living arrangements leading up to the reported abuse, he confirmed in large part the testimony of the victim's mother and his mother.

The Defendant stated that he and the victim's mother had discussed inappropriate touching with the victim. Specifically, the victim was told that it was "terribly inappropriate[,]" that if it happened, it was not her fault, and that she should tell someone she trusted. The Defendant stated that when the victim's mother confronted him with the reported abuse, he told her to take the victim to the hospital. He denied telling her to "keep it quiet" or come home to discuss things. While he did want to talk to the victim's mother about what happened, he did not tell her "not to tell anyone" or "not to go to the police[.]" At nighttime, the children made up stories from scratch to encourage their creativity, and the victim was never allowed in his bedroom to sleep. The Defendant stated he continued his relationship with the victim's mother until she moved to Ohio.

The Defendant consistently denied the allegations of sexual abuse against him and voluntarily went to the police station because he "didn't do anything [and] didn't have a reason not to go." In his interview at the police station, the Defendant completely denied the sexual abuse but was arrested in June 2015, approximately six months after the allegations were made. The Defendant testified that he had an "excellent relationship" with the victim, viewed the victim as his own child, and felt "horrible" to hear her make these allegations against him.

On cross-examination, the Defendant agreed the stories that the victim made up at bedtime never included "penises with liquid coming from them[,] penises going into mouths[,] penises rubbing genital areas[, or] hands going up and down on a penises[.]" He was "[100] percent sure" that the victim never saw his penis or saw him masturbate or ejaculate. He stated that he had a "good relationship" with the victim and often helped her with math homework and soccer skills. The Defendant denied that the victim sat in his lap or got into bed with him. The Defendant opined the victim possibly saw him engaged in sexual activity with her mother, but he could not be sure.

Based on the foregoing evidence, the trial court found the Defendant guilty of two counts of aggravated sexual battery (counts 2 and 4) and not guilty of the remaining counts.[4] The trial court subsequently sentenced the Defendant as a Range I, standard offender to eight years for each count, to be served concurrently. After filing a timely notice of appeal, the Defendant's case is now properly before this court.

**ANALYSIS**

**I. Sufficiency of the Evidence.** In challenging the evidence supporting his aggravated sexual battery convictions, the Defendant contends that the only direct

---

[4] The Defendant was originally charged with five counts of aggravated sexual battery and two counts of rape of a child.

evidence of sexual contact was from the forensic interview of the victim which "was infested with prompting and reinforcing a story of abuse rather than being an exercise in truth-finding." The State maintains that the evidence was wholly sufficient to support the Defendant's convictions of aggravated sexual battery. Upon review, we agree with the State.

When a defendant challenges the sufficiency of the evidence supporting a conviction, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." This standard applies to convictions based upon direct, circumstantial, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, and this court will not reweigh or reevaluate the evidence. State v. Sutton, 166 S.W.3d 686, 689-90 (Tenn. 2005). This court has stated that "[a] guilty verdict . . . approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient[.]" Id. (citation omitted).

The Defendant was convicted of two counts aggravated sexual battery, a Class B felony, as defined in Tennessee Code Annotated section 39-13-504. In order to sustain a conviction of aggravated sexual battery, the State must prove beyond a reasonable doubt that the Defendant made "unlawful sexual contact with a victim . . . less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). The term "sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6). The term "intimate parts" is defined as including "semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

- 10 -

The proof supporting the State's election of offenses supporting the Defendant's aggravated sexual battery convictions (counts 2 and 4) was based on the victim's testimony that "her hand [was] going up and down on [the Defendant's] private," the "rubbing and patting . . . on [the victim's] private one with [the Defendant's] private[,]" the victim's description that the Defendant lifted their shirts so their bellies were touching while her pants and underwear were removed, and that the Defendant "was patting [his private] on the outside [of her] private." In this appeal, the Defendant focuses primarily on the fact that the only direct proof of sexual contact offered at trial was from the forensic interview and on inconsistencies in the victim's testimony at trial and in her interview. He complains that the victim did not provide in court testimony about any sexual contact by the Defendant. Contrary to the Defendant's assertion, the record shows that the victim did in fact provide testimony at trial regarding the Defendant's sexual abuse. Specifically, prior to the introduction of the forensic interview, the victim identified on diagrams of a boy and girl the body parts with which the Defendant inappropriately touched her. The DVD of the forensic interview was then admitted into evidence without objection. The DVD contained the victim's forensic interview which thoroughly detailed the extent of the Defendant's sexual abuse of the victim. In addition, the victim was present at trial and subject to cross-examination, during which the court was able to assess her credibility.

Finally, this court has repeatedly held that the testimony of a minor victim, alone, is sufficient to uphold a conviction. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003) (quoting State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)); see also State v. Christopher Lee Blunkall, No. M2014-00084-CCA-R3-CD, 2015 WL 500751, at *10 (Tenn. Crim. App. Feb. 5, 2015) (holding that a minor victim's testimony was sufficient despite lack of corroborating evidence, including the defendant's semen); State v. Shropshire, 45 S.W.3d 64, 70 (Tenn. Crim. App. 2000) (affirming a conviction for aggravated sexual battery where "the victim testified that she was under thirteen (13) years old at the time of the incident in question, and that the defendant forced her to touch his penis"). Although the nine-year-old victim did not restate in detail at trial the abuse as described in her forensic interview, the trial court assessed her credibility and resolved any seeming inconsistencies with the challenged convictions in the State's favor.

Here, the victim testified that her statements in the forensic interview were true. During the interview, she described multiple occasions of abuse by the Defendant. The interviewer asked the victim a series of open ended questions and did not lead the victim in her responses. The victim described with words and demonstrated with hand motions how the Defendant forced her to engage in inappropriate sexual conduct with him. He forced the victim to touch his genitalia with her hands in an up and down motion until "water" came out and rubbed and patted his genitalia on the victim's genitalia and buttocks. Viewed in the light most favorable to the State, we conclude that the evidence

was sufficient for the trial court to find the Defendant guilty of two counts of aggravated sexual battery. Accordingly, the Defendant is not entitled to relief.

**II. Inconsistent Verdicts.** The Defendant also argues that the trier of fact inappropriately "split the verdict" by sustaining only two of his seven convictions, implying a lack of evidence. In response, the State contends that the trial court properly returned a verdict consistent with the proof at trial. The State correctly explains that a "split verdict," which usually occurs when a jury returns a non-unanimous verdict, did not occur in this case. See, e.g., State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993); State v. Richard Lee Gentile, No. 03C01-9506-CR-00171, 1997 WL 21366, at \*2 (Tenn. Crim. App. Jan. 21, 1997), perm. app. denied (Tenn. Sept. 15, 1997). Nevertheless, we glean from the context of the Defendant's argument that he meant "inconsistent verdict" which exists when a defendant is convicted "of one offense and acquit[ed] of another offense even though both counts stem from the same criminal transaction." State v. Finch, 465 S.W.3d 584 (Tenn. Crim. App. Nov. 22, 2013). In either case, we agree with the State.

It is well-established in this State that "consistency between verdicts on separate counts of an indictment is not necessary." Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973). Appellate courts will not disturb seemingly inconsistent verdicts as doing so would require inappropriate speculation into the trier of fact's reasoning. Id. Rather, each count in an indictment is treated as a separate indictment, and so long as there is sufficient evidence to support the defendant's conviction, the verdicts will be upheld. Id. at 93-94. Furthermore, the trier of fact, whether judge or jury, has within its discretion the ability to return a verdict finding the defendant guilty of some counts and not guilty of others pursuant to the evidence adduced at trial. See 7 Tenn. Prac. Pattern Jury Instr.-Crim. 41.03 ("The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it. The defendant may be found guilty or not guilty of any or all of the offenses charged."); State v. Davis, 466 S.W.3d 49, 72 (Tenn. 2015) ("Inconsistent verdicts on multiple charges against a single defendant may take the form of an inconsistency between a conviction and an acquittal."); Finch, 465 S.W.3d at 584 ("[D]isturbing seemingly inconsistent verdicts would have required inappropriate speculation as to the [trier of fact]'s reasoning."). Accordingly, the only question is whether the evidence is sufficient to support the Defendant's convictions for aggravated sexual battery. As we have already discussed above, the State presented sufficient evidence to support the Defendant's convictions of aggravated sexual battery. As such, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Upon our review, we conclude that the evidence is sufficient to support the Defendant's aggravated sexual battery convictions. The judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE